# 21-3058-cv(L),
# 22-0019-cv(CON), 22-0159-cv(CON)

## United States Court of Appeals
### for the
## Second Circuit

JAMES CONTANT, on behalf of themselves and all others similarly situated,
MARTIN-HAN TRAN, on behalf of themselves and all others similarly situated,
CARLOS GONZALEZ, on behalf of themselves and all others similarly situated,
UGNIUS MATKUS, on behalf of themselves and all others similarly situated,
JERRY JACOBSON, on behalf of themselves and all others similarly situated,
PAUL VERMILLION, on behalf of themselves and all others similarly situated,
SANDRA LAVENDER, VICTOR HERNANDEZ, FX PRIMUS LTD.,
CHARLES G. HITCHCOCK, III, TINA PORTER,

*Plaintiffs-Appellees,*

– v. –

AMA CAPITAL MANAGEMENT, LLC,

*Movant-Appellant,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR MOVANT-APPELLANT
## (REDACTED)

SCOTT O. LUSKIN
PAYNE & FEARS LLP
200 North Pacific Coast Highway, Suite 825
El Segundo, California 90245
(310) 689-1750

DAMIAN R. CAVALERI
HOGUET NEWMAN
  REGAL & KENNEY, LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, New York 10165
(212) 689-8808

*Attorneys for Movant-Appellant*

BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., THE BANK OF TOKYO MITSUBISHI UFJ LTD., BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BNP PARIBAS GROUP, BNP PARIBAS NORTH AMERICA, INC., BNP PARIBAS SECURITIES CORP., BNP PARIBAS PRIME BROKERAGE, INC., CITIGROUP INC., CITIBANK, N.A., CITICORP, CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., THE GOLDMAN SACHS GROUP, INC., GOLDMAN, SACHS & CO., HSBC HOLDINGS PLC, HSBC BANK PLC, HSBC NORTH AMERICA HOLDINGS, INC., HSBC BANK USA, N.A., HSBC SECURITIES (USA) INC., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., MORGAN STANLEY, MORGAN STANLEY & CO., LLC, MORGAN STANLEY & CO. INTERNATIONAL PLC, RBC CAPITAL MARKETS LLC, ROYAL BANK OF SCOTLAND GROUP PLC, RBS SECURITIES INC., SOCIETE GENERALE S.A., STANDARD CHARTERED BANK, UBS AG, UBS GROUP AG, UBS SECURITIES LLC, GOLDMAN SACHS & CO. LLC, THE ROYAL BANK OF SCOTLAND PLC, FOREX CAPITAL MARKETS, LLC,

*Defendants,*

FXDIRECTDEALER, LLC (FXDD),

*Movant.*

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO RULE 26.1 OF THE
## FEDERAL RULES OF APPELLATE PROCEDURE

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, AMA Capital, LLC, Movant/Claimant/Appellant in this action, states that it does not have a corporate parent, and there is no publicly held corporation that owns 10 percent or more the LLC.


DATED: March 29, 2022      PAYNE & FEARS LLP
Attorneys at Law


By:      /s/ Scott O. Luskin
          SCOTT O. LUSKIN

Attorneys for Appellant
Local Counsel
Damian R. Cavaleri, Esq.
HOGUET NEWMAN REGAL
& KENNEY, LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165
Tel.: (212) 689-8808
Fax: (212) 689-5101
Email: dcavaleri@hnrklaw.com

4875-4803-2793.1

# Table of Contents

Jurisdictional Statement ...................................................................1

Preliminary Statement ....................................................................2

Issues Presented ...........................................................................3

Statement of the Case .....................................................................4

I.     AMA Is a Small California Currency Trader ...............................4

II.    The *Contant* Indirect Antitrust Class Action Claim .........................7

III.   The *Contant* Plaintiffs Obtain Limited Discovery from RFEDs and
then Settle ...........................................................................8

IV.   AMA's Arduous Claim Process ...............................................12

V.    AMA's Claim Is Denied By the Claims Administrator Raising Issues
Never Identified by Class Counsel ..........................................18

VI.   The Trial Court Affirms the Claim Assessment Permitting Class
Counsel to Assert that Documentation Issues Prevent Validating the
Claim...............................................................................20

Summary of Argument....................................................................24

Argument....................................................................................27

I.     Standard of Review............................................................27

II.    The Settlement Agreement Required the Claims Administrator to
Consider all of AMA's Submissions.........................................27

        A.    The Settlement's Express Terms Require Reviewing AMA's Entire
Submission ................................................................28

        B.    The Implied Covenant of Good Faith and the District Court's
Equitable Powers Also Support Reviewing the Entire Submission....36

III.   AMA's Due Process Rights Were Violated by Applying Improper
Evidentiary Standards........................................................38

        A.    The Proper Evidentiary Standard to Analyze Claimants' Claims ......39

                1.    The one for one statement requirement was improper ........41

                2.    The court below improperly required AMA to document that
trades with venues were back-to-backed with defendant
banks ................................................................44

B. Making Claims in *Contant* and FOREX Does Not Prevent Recovery by AMA ............................................................................... 51

C. AMA's Use of Prime Brokers Is Not a Reason to Affirm .................. 53

IV. If AMA Does Not Have Standing to Pursue Its Appeal Without Intervention, the District Court Erred in Denying AMA's Motion to Intervene ........................................................................................ 56

Conclusion ......................................................................................... 58

# Table of Authorities

**Page(s)**

## Federal Cases

*Dahingo v. Royal Caribbean Cruises, Ltd.*,
  312 F.Supp.2d 440 (S.D.N.Y. 2004) ........................................................36, 37

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
  149 F.R.D. 55 (S.D.N.Y. 1993) ...................................................................57

*Waldman ex rel. Elliott Waldman Pension Tr. v. Riedinger*,
  423 F.3d 145 (2d Cir. 2005) ..................................................................27, 29

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982)..............................................................................38, 39

*McCarthy v. Am. Int'l Grp., Inc.*,
  283 F. 3d 121 (2nd Cir. 2002) ....................................................................35

*N.Y. News Co. v. Kheel*,
  972 F. 2d 482 (2nd Cir. 1992) ................................................................1, 27

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017) ........................................................................27

*Rothstein v. Am. Int'l Grp.*,
  837 F. 3d 195 (2nd Cir. 2016) ....................................................................56

*Terwilliger v. Terwilliger*,
  206 F. 3d 240 (2nd Cir. 2000) ........................................................30, 32, 33

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
  41 F. 3d 1570 (2nd Cir. 1994) ....................................................................40

*Zients v. LaMorte*,
  459 F.2d 628 (2d Cir. 1972) ........................................................................39

## State Cases

*Dalton v. Educational Testing Svs.*,
  87 N.Y.2d 384 (1995)..................................................................................36

*Jacobson v. Sassower*,
66 N.Y.2d 991 (App. Div. 1985) ..................................................35

*Reda v. Eastman Kodak Co.*,
649 N.Y.S.2d 555 (App. Div. 1996) ..............................................29

*William A. White/Tishman E., Inc. v. Banko*,
566 N.Y.S.2d 628 (App. Div. 1991) ..............................................36

**Federal Statutes**

28 U.S.C. § 1291 .............................................................................1

28 U.S.C. § 1332 .............................................................................1

Fed. R. App. P. 4 ...............................................................1, 4, 5, 6

Fed. R. App. P. 28 ..........................................................................1

Fed. R. Civ. P. 23 ...................................................................38, 41

Fed. R. Civ. P. 24 ........................................................................57

## Jurisdictional Statement

The district court had jurisdiction in this action brought under the Class Action Fairness Act of 2005, pursuant to 28 U.S.C. § 1332(d).

The district court entered an order denying in part AMA Capital, LLC's[1] claim to a share of the settlement fund on November 16, 2021, and denied AMA's motion for reconsideration on January 5, 2022. (SPA 4-5, 14-20.)[2] These orders finally disposed of AMA's claim. FED. R. APP. P. 28(a)(4)(D). This Court has jurisdiction to consider the appeal from both orders as final decisions of the district court. 28 U.S.C. § 1291. Appellant timely appealed both orders on December 15, 2021, and January 25, 2022, respectively, pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A). (Vol. 12 JA 3119, 3123.)

The district court also denied AMA's motion to intervene, which was entered on December 8, 2021. (SPA 6-8.) This Court has jurisdiction over an appeal from that order pursuant to 28 U.S.C. § 1291. *N.Y. News Co. v. Kheel*, 972 F. 2d 482, 485 (2nd Cir. 1992). Appellant timely appealed the district court's order denying intervention on January 5, 2022 (Vol. 12 JA 3122). FED. R. APP. P. 4(a)(1)(A).

---

[1] AMA Capital, LLC, is managed by AMA Capital Management, LLC. The docket incorrectly refers to management rather than AMA Capital, LLC.

[2] The three appendices are the Special Appendix ("SPA"), the Joint Appendix ("JA"), and Confidential Appendix ("CA").

## Preliminary Statement

AMA is a small, high volume foreign currency trader based in California. In 2017 plaintiffs filed a class action against several banks alleging indirect antitrust violations under California and other states' laws for price fixing in the foreign currency market. The claims assert that defendant banks' antitrust violations injured customers like AMA trading in the retail currency market with companies called retail foreign exchange dealers (RFEDs). RFEDs trade with customers, and then make corresponding back-to-back trades with banks, profiting by charging the customer a small markup.

The matter settled in 2020, but for some reason AMA was not sent notice. AMA happened upon the settlement website, and requested to file a late claim. Class counsel agreed, and AMA submitted the claim form, a list of millions of trades with RFEDs, and more than a thousand of pages of supporting documents. But AMA's massive claim, likely worth millions under the pro rata settlement, was mostly rejected.

The claims administrator and class counsel asserted that AMA somehow failed to properly document its trades. This finding, accepted by the district court without analysis, incorrectly applies the settlement's express terms and violates AMA's due process rights.

AMA provided exemplar statements supporting the trades listed in the claim spreadsheet. When the claim assessment stated that AMA needed to provide statements supporting every trade, within the twenty days permitted by the settlement to cure, AMA complied for the trades still at issue. But the administrator refused to consider these documents. Making matters worse, ignoring the claim form's terms, the assessment also seemed to require AMA to provide not just evidence that it traded with RFEDs, but that those trades were back-to-backed with a bank. That trade information is not generally available, and even class counsel failed to obtain it from AMA's RFEDs by subpoena. This additional requirement, therefore, violates AMA's due process rights and should be rejected. There is no other valid reason to deny AMA's claim, and the trial court's orders should be reversed and remanded with directions to accept AMA's trades with the ███ RFEDs still at issue in this appeal—██████████████████████████ ████.

### Issues Presented

1.    Whether the district court interpreted the class action settlement to deny AMA a meaningful right to cure its claim inconsistent with express contractual terms, the covenant of good faith, and the proper use of the court's equitable power.

2.     Whether AMA's due process rights were violated by permitting the claims administrator to utilize heightened evidentiary burdens to prove AMA's claim under the class action settlement.

3.     To the extent this Court denies AMA independent standing to appeal as a class claimant, whether the district court erred in denying AMA's motion to intervene to preserve its appeal.

## Statement of the Case

### I.     AMA Is a Small California Currency Trader

AMA Capital, LLC, is a small California company formed in 2006. (Vol. 1 CA 118 ¶ 5.) It is currently operated by two of its three owners, Andrew Lutomirski and Andrew Schwartz. (*Id*.) The company has been trading currency since its formation. (*Id.*) "AMA uses proprietary methods to trade high volumes of currency, and through its history has traded with numerous currency dealers." (*Id.*) These dealers are sometimes referred to as venues. (Vol. 1 CA 119 ¶ 7.) Among the many venues were retail foreign exchange dealers (RFEDs), including

███████████████████████████████████████████████. (CA 289-301; *see* Vol. 8 JA 1930-31; Vol. 4 JA 909; Vol. 1 CA 20.) AMA also directly traded with banks. (*E.g.*, Vol. 1 CA 123 ¶ 14.)

To make trades, AMA usually established an account with a venue. (Vol. 1 CA 120 ¶ 8.) This permitted AMA to make various currency transactions,

including spot foreign currency (FX) trades. (*Id.*; *see also* Vol. 2 CA 289-95.) A spot FX trade means that AMA agrees to buy or sell one currency for another in the near future. (Vol. 1 CA 120-21, 125-27.)

For example, AMA could trade U.S. dollars (USD) for New Zealand dollars (NZD) with ███, usually shown as the currency pair USD/NZD. (Vol. 1 CA 120-21, 125-27.) AMA would receive from the venue electronically (usually through FIX protocol) a continuous stream of pricing for the NZD/USD currency pair. (*Id.*) If AMA wanted to trade, it would send back a FIX message to place an order at the quoted price. (*Id.*) The venue would then reply with a FIX message confirmation. (*Id.*)[3]

Sometimes AMA used a prime broker to assist with clearing trades it made with venues. (Vol. 1 CA 121-22 ¶¶ 10-13.) The prime broker would hold AMA's funds in an account, so AMA could keep its currency in one place. (*Id.*)  In the ███ example, once the details were agreed to by AMA and ███, AMA would electronically notify its prime broker of the trade. (Vol. 1 CA 125-27.) The prime

---

[3] These messages are industry standard Financial Information eXchange (FIX) Execution Report messages. (Vol. 1 CA 119 ¶ 7; *see* Vol. 1 CA 58 [https://fiximate.fixtrading.org/en/FIX.Latest/msg9.html].) The messages identify the parties to the trade, terms (including the price, the currencies traded, the volume), date, and several other categories of additional information. (Vol. 1 CA 119 ¶ 7 n. 1, 125-27.)

broker would subsequently collect the currency that AMA purchased from ███

and transmit the currency that AMA sold to ███. (Vol. 1 CA 121-22 ¶¶ 10-13.)

   AMA maintains extensive trading activity records. It has a SQL database of

detailed trade data from executed trades, which is populated from electronic

messages with its trading partners. (Vol. 1 CA 119 ¶ 7.) AMA also maintains an

archive of the underlying electronic messages. (*Id*.) This archive contains a

massive amount of information; for example, one month of FIX message trade

confirmations from a single venue (formatted as PDF) was 686 pages. (*Id*.; *see also*

Vol. 2 CA 297 [███ identified 2011-12].) In addition to FIX messages, AMA

also received invoices and statements from trading partners. (Vol. 1 CA 120 ¶ 8.)

These were usually sent to AMA by email, and AMA maintained them as business

records. (*Id*.) They came in various formats, including PDF, HTML, or

spreadsheet. (Vol. 1 CA 120 ¶ 8; Vol. 2 CA 297-301.) Many statements, like those

for ████████████████████████████████████, have trade

level detail showing the dates, currency pairs, volume, and price. (*Id*.; *see also* Vol.

2 CA 289-95 [statement comparisons].)

   Unbeknownst to AMA there was allegedly a conspiracy that fixed the prices

of the currency market AMA had participated in for years. (Vol. 1 JA 93-182.)

## II.    The *Contant* Indirect Antitrust Class Action Claim

In 2017 plaintiffs filed the *Contant* complaint in the Southern District of New York for state and federal antitrust violations against several banks for alleged manipulation of the foreign currency trading market. (Vol. 1 JA 93-182.) The defendants—horizontal competitors—conspired to fix the prices of foreign currencies and foreign currency instruments. (Vol. 3 JA 720 ¶ 1.)

*Contant* was not the first case to assert antitrust claims in this space. One parallel case before the same district judge, known as FOREX (Case No. 13-cv-7790-LGS), brought federal antitrust claims against the same bank defendants. (Vol. 3 JA 721 ¶ 5.) FOREX sought damages for trades made by class members *directly* with banks. (*Id.*) That case settled for more than $2 billion. (*Id.*)

*Contant* did not seek the same relief as FOREX, instead taking advantage of state laws to allege damages from trades with RFEDs rather than banks directly. (*E.g.*, Vol. 3 JA 776 ¶ 148; Vol. 4 JA 817-819 ¶ 268.) The *Contant* complaint alleges a "straightforward pricing model in which the RFED purchased the FX Instrument from a liquidity provider (Defendant) and resold that same FX Instrument to the retail customer (Plaintiff) for a price that is equal to the amount that the RFED paid to the Defendant, plus a retail markup." (Vol. 3 JA 778 ¶ 155.) Because the retailer's pricing was based on and highly correlated with the banks'

illegally inflated rate, the customers were injured in the same way as direct class members in FOREX. (*Id.* at 778-90 ¶¶ 155-184.)

*Contant* explained that the US FX market is "concentrated and dominated by Defendants." (Vol. 3 JA 756 ¶ 93.) This was crucial to the case proceeding, and the district approved the claims because "[t]he Proposed Complaint alleges that every FX instrument Plaintiffs purchased from a Retail Dealer is traceable back to a Defendant liquidity provider." (Vol. 3 JA 696, 715-16.) The court below reasoned that there was little question defendants were a substantial factor in the indirect plaintiffs' injuries because the complaint "alleges that the conspiring Defendant liquidity providers controlled 90% of trading in the global FX spot market and 98% of trading in the United States FX spot market." (*Id.* at 697.)

## III. The *Contant* Plaintiffs Obtain Limited Discovery from RFEDs and then Settle

To prove up the claims, plaintiffs needed discovery from the RFEDs. Class counsel subpoenaed more than sixty. (Vol. 8 JA 1929-30.) The subpoenas sought information identifying the retail customers that made currency trades with RFEDs and those trades the RFEDs made with defendant banks. (*See, e.g.*, Vol. 4 JA 852-897.)

Class counsel explained that the "information requested in the [] subpoena is central to this case and unavailable from any other source other" than the

subpoenaed party. (Vol. 4 JA 915.) The subpoenas sought "both retail side and liquidity side" data. (Vol. 8 JA 1954-1955.)  This "transactional data between [an RFED] and the defendants and between [an RFED] and our clients" allows class counsel to "trace what we need to trace." (*Id*. at 1967.)

Regardless of the crucial nature of these documents, class counsel obtained usable responses from only a small group of RFEDs. (Vol. 11 JA 2698-706; *see also* Vol. 8 1929-30.) There appeared to be four main respondents: Forex Capital Markets (FXCM), GAIN Capital, Oanda Corporation, and FXDirect Dealer, LLC (FXDD). (*Id*.)

Parallel to this discovery, class counsel engaged in settlement discussions with different groups of defendants. These discussions bore fruit, resulting in three separate settlements totaling just under $25 million. (Vol. 8 JA 2073-85.)

The settlement agreements had substantially the same form.  (*Id*.) They established settlement classes for eight states, including California. (*E.g.*, Vol. 9 JA 2097-2101.) Those classes comprised "All persons and entities who, during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator and were thereby injured [in the applicable state] by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator." (*Id*. at 2098 § III.(a)(iii).) There was no limitation on trading

venue, regardless of whether class counsel obtained records of the RFED's transactions. (*Id*.)

Class members that made approved claims could receive a portion of the settlement fund. (Vol. 9 JA 2111 § X.(f)(v).) That fund would be distributed pro rata, utilizing a formula approved by the district court. (*Id*.) In return, class members would provide a release to defendants and their affiliates. (*Id*. at 2094-95 §§ II.(ii), (jj).)

The trial court approved the settlements. (Vol. 11 JA 2658-74.) In August 2020 direct notice went to those in records class counsel obtained from the four RFEDs. (*Id*. at 2623-25 ¶¶ 8,12.) Publication notice was posted to a "proprietary whitelist of websites," a settlement website was established, and the notice appeared in other media. (*Id*. at 2627-28 ¶¶ 22-27.) In December 2020, a claim form was sent to those receiving direct notice as well as reminder emails, including personalized messages for those with the largest claims. (Vol. 12 JA 2908-10 ¶¶ 6, 9-10.)

Putative class members were given four months to submit claims. (*Id*. at 2908-09 ¶¶ 6-7.) There were two types. Option One claimants would have their award determined by the claims administrator using the transactional data obtained in discovery. (*Id*.; Vol. 11 JA 2698-705.) Option Two claimants instead needed to submit their "own detailed transactional records…reflecting your transactions with

RFEDs or other eligible entities." (Vol. 11 JA 2700.) These records, "e.g., account statements and transaction confirmations," were to be submitted along with a claim form spreadsheet that identified the trades claimed, date, volume, currency pair, and venue. (*Id*.) Claimants certified under penalty of perjury that the claimant "made the identified purchases during the Class Period." (Vol. 11 JA 2702.) The pro rata payment would be calculated the same for both options. (*Id*. at 2701)

Heffler Claims Group, the claims administrator, was responsible for the claim process. (Vol. 9 JA 2090 § II(f).) The settlement permitted proofs of claim that do not meet the submission requirements to be rejected by the administrator. (*Id*. at 2114 § XI.(d)(iv).) But there was an opportunity to cure. Before rejection, the "*Claims Administrator shall* communicate with the claimant in order to remedy the curable deficiencies." (*Id*. [emphasis added]) The claims administrator needed to notify all claimants it proposed to reject in writing—setting forth the reasons therefor. (*Id*.) After receiving the written notification, the claimant had twenty days to respond with a statement of reasons contesting the rejection along with supporting documents. (*Id*. at 2115 § XI.(d)(v).) If after the response, the claims administrator and the claimant could not work out their differences, class counsel was to submit the dispute to the court for review. (*Id*.)

There was a little over a 10% claim rate. (Vol. 12 JA 2908-11 ¶¶ 6, 14-15.) From more than 11,000 claims, fewer than 100 were Option Two. (*Id*. ¶ 15.)

## IV.    AMA's Arduous Claim Process

AMA was not in the RFED records obtained by class counsel, so it was not sent notice. (Vol. 1 CA 25, 77-79, 117 ¶ 2; Vol. 12 JA 2794-95.) But on May 12, 2021, AMA saw the *Contant* settlement page while looking for the FOREX settlement website. (Vol. 1 CA 25, 77-79.)[4] AMA had made a claim in FOREX. (Vol. 1 CA 133-34.)

AMA contacted class counsel that day to inquire about filing a late claim. (Vol. 1 CA 25-26, 77-79.) AMA followed up on May 14. (*Id.* at 25-26.) Class counsel then responded, asking for AMA's RFED trading partners. (*Id.*) Class counsel wanted the information so that it could be "reviewed and considered within the next 7 days." (*Id.*) Class counsel offered to assist AMA with the late claim, explaining that "we cannot guarantee that you can participate in the distribution of the settlement funds but will do our best to help you assuming you meet the requirements to be a member of the settlement classes." (*Id.*)

AMA followed up immediately, trying to understand the required claim documentation. (Vol. 1 CA 132-41.) AMA's Schwartz explained that "[w]e will have a huge number of transactions and a huge number of accounts." (*Id.*) He wanted to submit the right ones. (*Id.*) To the extent possible, Schwartz hoped to avoid submitting records for every trade. (*Id.*) Schwartz explained to class counsel

---

[4] AMA created a timeline for the district court. (Vol. 12 JA 2794-95.)

that in FOREX, the experts merely did a "spot check instead of having us provide documentation for each and every one of the millions of transactions." (*Id.* at 139.) He also wanted to clarify that both FOREX and *Contant* included indirect trades, so not to cause problems by submitting the same claim in both matters. (*Id.*)

Class counsel responded with little guidance. He did not agree with spot checks and simply said that AMA would "need to supply some evidence to show that [the venues] fit the class definition." (Vol. 1 CA 138.) He did not say what records would provide this particular evidence. (*Id.*) But class counsel ultimately agreed that *Contant* and FOREX both include indirect trades. (*Id.* at 136-38.)

On May 20, AMA submitted its initial claim form and spreadsheet. (Vol. 1 CA 135-36.) Class counsel, not the settlement administrator, explained that AMA would need to provide account numbers and underlying transaction data (statements) to verify the trades. (*Id.* at 134.)

AMA immediately responded that the request was problematic. (Vol. 1 CA 133.) Schwartz explained that AMA's submission included ▮ venues and more than ▮ venue months. (*Id.*; *see also* Vol. 2 CA 296.) Pulling together statements and information for each would take immense time and resources. (Vol. 1 CA 133-36.)

Because AMA had a similar data issue in FOREX, Schwartz told class counsel that FOREX audited only four months of FIX messages for three venues.

(Vol. 1 CA 133.) He even provided the email exchange. (*Id*. at 134.) AMA

requested similar treatment in *Contant*. (*Id*. at 133.)

A few days later, on May 24, class counsel ignored the request to submit to

an audit. (Vol. 1 CA 29-33.) Instead—with only four days to respond—class

counsel vaguely said that "additional documentation" was needed. (*Id.*) Class

counsel also appeared to unilaterally reject several types of transactions and venues

that AMA thought met the class definition. (*Id*.)

To clear up class counsel's concerns, AMA provided explanations and

citations to public information. (Vol. 1 CA 29-33.) For example, class counsel

asserted ███████████ was not part of the class definition because it

supposedly did "not allow US-based retail customers to trade spot FX." (*Id*.) AMA

provided an article about ██████████ accepting US retail FX trades. (*Id*.)

Class counsel also asserted that ████████ facilitated direct trades rather than

indirect ones. (*Id*.) AMA provided publicly available information explaining

counsel was incorrect. (*Id*.) Class counsel did not respond to AMA's explanations.

A week later (on June 2) class counsel requested detailed statements and

other documentation from AMA, citing the claim form. (Vol. 1 CA 35.)[5] Despite

AMA's prior explanation that statements for ████ separate months would be

---

[5] The settlement does not require any minimum documentation, but
identifies statements and confirmations as examples of sufficient submissions.
(Vol. 9 JA 2113 § XI.(d)(i); *see also* Vol. 11 JA 2698-705.)

almost impossible to obtain, let alone to review in a timely manner, class counsel wanted them in just one week (June 9). (*Id.*)

Class counsel changed course on June 4, asking for information for 300 randomly chosen trades instead. (Vol. 1 CA 37-39.) AMA said it would comply, but wanted clarity before committing significant resources to obtain archived information. (*Id.*) AMA explained that gathering information for the 300 trades would take over "60 person-hours," and, because AMA received no response to its prior explanations that the trades were valid, the tiny company wanted some assurance its efforts would bear fruit. (*Id.*)

Class counsel responded that "no decision has been made as to the validity of AMA's claim." (Vol. 1 CA 37-39.) But confirmed too that "no decision has been made about whether less than all transaction data will suffice to support a claim." (*Id.*)

The next day AMA sent example "FIX messages that were sent by our counterparties to us" for the first three trades to see if that format would be acceptable like in FOREX. (Vol. 1 CA 41-42.) Class counsel responded that the FIX messages were not good enough. (*Id.* at 44.) He asserted that the messages "contain no information regarding the counterparty or location, so they would not be sufficient for purposes of validating your claim." (*Id.*) This ignored that the

counterparty was identified in the message and class counsel already knew AMA operated from California. (Vol. 1 CA 29-33, 40-44.)

To assist it, AMA hired an attorney with Payne & Fears in early June. (Vol. 12 JA 2780.) Payne & Fears communicated with class counsel and set up a meeting to discuss valid trades. (*Id*. at 2777-80.)

AMA still did not have clear direction after the meeting. AMA was not given examples of qualifying documents, a list of accepted venues, or access to the subject-matter experts. (Vol. 12 JA 2777-80.) The common refrain was "given the substantial FX trading in which your client engaged, we expect that the client would be familiar with what is required and whether or not it possesses the information." (*Id*. at 2777.)

Despite the lack of direction, AMA provided more information about its relationships with the venues on June 25. (Vol. 1 CA 46.) Class counsel, however, said on July 1 that the "materials and information provided to date are not sufficient to substantiate and validate AMA's claims." (*Id.*)

There was still hope. No determination had been made on AMA's claims, and class counsel stated that "to validate AMA's claim, we *require exemplars* of AMA's account and/or trade statements for the Relevant Time Period for each account for which AMA is making a claim." (Vol. 1 CA 46.) [emphasis added]. Class counsel also gave the first example of a valid statement—a trade statement

from ███████. (*Id.*)[6] But for some reason class counsel still contended that FIX

messages were not "sufficient evidence." (*Id.*) Class counsel wanted AMA's

contracts with venues to help determine if trades were indirect, meeting the class

definition, and an understanding of trades submitted in both *Contant* and FOREX.

(*Id.*)

On July 16, AMA submitted a revised claim form reducing its trades from

████████████ venues to only ██████ and provided thousands of additional pages of

documents, including contracts, invoices, trade statements, and fully formatted FIX

messages. (Vol. 1 CA 56-60; Vol. 2 CA 296-301.) The exemplar trade statements

covered every year of account in the class period for each venue claimed. (*Id.*) And

for the crucial venues—like ████████████████████████████████████████████

██—those statements contained the exact same trade level information as the

█████████ statement class counsel stated was acceptable on July 1. (Vol. 2 CA 297-

301.)[7]

---

[6] This statement identifies trades with ██████, including the date, currency
pair, and rate.  (Vol. 2 CA 298 [Monthly 2007-12.) It does not identify any bank
that back-to-backed the trade with ██████.  (*Id.*)

[7] AMA created a short comparison for the district court showing that the
statements all contain the same information as ██████. (Vol. 2 CA 289-95.)

-17-

**V.      AMA's Claim Is Denied By the Claims Administrator Raising Issues Never Identified by Class Counsel**

After AMA's July 16 submission of thousands of pages, it received a communication regarding the validity of its claim from the claims administrator *for the first time* on August 13. (Vol. 1 CA 7-87.) Unlike the back and forth with class counsel, the claim assessment went through each submitted venue and identified specific reasons to accept or deny AMA's trades. (*Id*. at 7-23.)

The sixteen-page letter accepted trades at ████ venues, ████████████ ████████████████████. (Vol. 1 CA 15, 19-20.) But not all trades. Rather than permit "exemplars" as class counsel had stated, the claim assessment denied trades "in any time period not covered by the submitted statements." (*Id*.) This limitation was applied to every venue. (*Id*. at 7-23.)

For no apparent reason, the acceptance was more limited for ████████ ████—despite the same trade level detail on each statement at all ████ accepted venues. (Vol. 1 CA 15, 19-20; Vol. 2 CA 289-95.) Rather than accept trades on all thirteen submitted statements (Vol. 2 CA 299), the assessment accepted only those trades where AMA provided FIX messages. (Vol. 1 CA 19-20.) FIX messages were necessary now even though class counsel said they were insufficient before. (*compare* Vol. 1 CA 19-20 and 44.)

There were myriad reasons the claim assessment rejected the other █████████ venues. The supposed deficiencies relevant to this appeal are:

1.      AMA submitted trade statements for ███████████████████████ ████████, but the "submitted materials do not demonstrate that AMA transacted in FX instruments with [the venue] or a qualifying third-party which, in turn, transacted with a defendant in FOREX." (Vol. 1 CA 12, 17, 20.) This specific reason for denial was never raised before the claim assessment.

2.      No margin account with the venue. (Vol. 1 CA 12, 16-17, 19-20.) This issue had not been raised before either.

3.      Using a prime broker to clear transactions prevented these trades from meeting the class definition. (Vol. 1 CA 12, 16-17, 19-20.) This too had never been raised before for any venues.

The assessment, as required by the settlement, explained that "If AMA desires to contest the rejection of its claims, in whole or part, AMA must, within twenty (20) days after the date of mailing of this notification serve upon the Claims Administrator a notice and statement of reasons indicating its grounds for contesting the rejection along with any supporting documentation." (Vol. 1 CA 23.)

AMA timely responded. First, on August 26, AMA provided additional ████████ and ██████████████ statements along with ████████████ FIX messages for another month. (Vol. 1 CA 62; Vol. 2 CA 297-98.) On September 2,

AMA provided additional statements and FIX messages along with information responding to the claim assessment's concerns, including the one-for-one statement rejection, and provided information from FOREX about the preliminary trade acceptances and rejections it had just received. (Vol. 1 CA 65-79; Vol. 2 CA 297-301.)[8]

After receiving the September 2 submission, class counsel reported the status of AMA's claim to the trial court. (Vol. 11 JA 2715.) He acknowledged that AMA provided a timely response to the claim assessment, committing to evaluate it and "work diligently to coordinate and complete the analysis." (*Id*.) Yet no further submissions were considered. (Vol. 1 CA 162.)

AMA met with class counsel shortly thereafter to discuss the issues raised in the claim assessment and AMA's response. (Vol. 1 CA 2.) They could not resolve the claim, so class counsel presented the issues to the trial court. (*Id*.)

## VI. The Trial Court Affirms the Claim Assessment Permitting Class Counsel to Assert that Documentation Issues Prevent Validating the Claim

On September 15, class counsel apprised the district court of the dispute. (Vol. 11 JA 2716-18.) Despite the extensive issues, class counsel suggested AMA

---

[8] The next day class counsel belatedly asserted that he never meant for exemplars to waive the supposed one-for-one statement requirement. (Vol. 1 CA 81-87.)

have only three pages of briefing. (*Id.*) AMA requested more, receiving only five. (*Id.* at 2721.)

Class counsel's letter brief argued that the claim should be denied for three reasons outlined in the claim assessment. First, AMA supposedly failed to provide "required 'detailed transactional records' to corroborate the denied transactions self-identified on its Option Two Spreadsheet" for the venues AMA continued to contest, i.e. one-for-one statements not exemplars. (Vol. 1 CA 4, 156.) Second, transactions using a prime broker "do not meet the Court-approved Settlement Class Definition." (*Id.*) And third, AMA failed to identify transactions submitted in *Contant* and FOREX. (Vol. 1 CA 5.) Class counsel also argued that the court should deny the entire claim—which had already been approved in part—merely because it was late. (*Id.* at 3-4.)

AMA opposed, explaining that its trades met the class definition, the one-for-one documentation requirement was unnecessary, unfairly prejudicial, and not required by the settlement, all statements submitted should be reviewed, and that the submission of some of its trades in both matters was not a problem. (Vol. 1 CA 110-14.) AMA also explained that it met all the factors permitting it to file a late claim, especially after spending thousands of dollars and hundreds of hours providing documents at class counsel's request. (*Id.*)

On October 29, 2021, the district court initially ruled AMA's late claim should be considered and approved trades already accepted for payment. (SPA 1-3.) It vaguely found that class counsel's one-for-one documentation argument should be accepted. (*Id.*) The court explained that "detailed transactional records are necessary 'for purposes of calculating [claimants'] pro rata award." (*Id.*) The court did not define detailed transactional records and its order did not evaluate any particular document. (*Id.*) The court asked for further briefing on prime brokers, and AMA's supposed purchase of access to trading platforms (mentioned in class counsel's letter brief, but not argued as a reason for denial), and trades submitted in FOREX. (*Id.* at 2-3.) It appeared the one-for-one issue was the only supposed documentation problem, otherwise there would be no reason for the additional information requested by the trial court. (*Id.*)

AMA submitted the required briefing, explained why prime brokers did not exclude AMA's trades, that its trades with supposed platforms still met the class definition, and identified generally duplicate trades. (Vol. 1 CA 164-Vol. 2 CA 276.) Class counsel briefed a different topic, asserting documentation issues invalidated all AMA's claims not accepted in the prior order. (Vol. 1 CA 158-62.) The submitted documents supposedly were not detailed transactional records and that, in certain cases, the documents did not show that the trades were back-to-backed with defendant banks. (*Id.*)

The court accepted class counsel's argument without giving AMA a chance to respond. (SPA 4-5.) There was no analysis of the issues or discussion of evidence in the order. (*Id*.) The trial court merely stated that "WHEREAS, class counsel provides that for each of the claim denials contested by AMA, AMA failed to submit detailed transactional records (Dkt. No. 525). It is hereby ORDERED that all of the claims denied by class counsel are denied because they all lack detailed transactional records as required by the settlement." (*Id*.)

AMA sought reconsideration of the court's order outlining that (1) all submissions should be reviewed as required by the settlement, (2) AMA submitted detailed transactional records for the contested venues, and (3) that while AMA should not have to show that the trades were back-to-backed with the defendant banks, it had evidence anyway. (Vol. 2 CA 277-301.) The court refused to reconsider, never analyzing whether the submitted documents were the required transactional records or sufficient to demonstrate that the trades were back-to-backed with defendant banks. (SPA 14-20.)

To preserve its right to appeal, AMA requested intervention. (SPA 6-8.) The trial court denied the motion, finding it unnecessary because claimants have independent standing to appeal. (*Id*.)

AMA timely appealed the orders on its claim and intervention. (Vol. 12 JA 3119, 3122-23.) In the meantime, the trial court ordered that the settlement funds

be distributed after AMA's appeal. (SPA 9-13.) AMA was allotted only about

████, yet AMA's estimated claim value with full and proper consideration is in

the millions. (Vol. 2 CA 323-27 ¶¶ 9-12.)

AMA's appeal pursues outstanding claims at ██ venues—███████████

████████████████████. Trades with these venues all meet the class

definition, and AMA documented the trades with detailed transactional statements.

Several statements were submitted on July 16 with even more timely offered on or

before September 2.

## Summary of Argument

The *Contant* class action settlement agreements must be interpreted

according to normal contract principles. *See Waldman ex rel. Elliott Waldman*

*Pension Tr. v. Riedinger*, 423 F.3d 145, 148 (2d Cir. 2005). The settlement's

express terms give claimants twenty days to cure any proposed rejection after

written notice from the claims administrator. (Vol. 9 JA 2114-15 § XI.(d)(iv).)

The claims administrator, class counsel, and the district court all misinterpreted the

settlement, denying AMA the right to submit additional documents in response to

the claim assessment. (SPA 16-18.) The district court's interpretation, finding that

informal communications with class counsel could substitute for the deficiency

notice from the administrator, is improper. That finding was compounded by a

determination that the cure provision was akin to a motion for reconsideration, so

additional documents could be ignored anyway. (*Id*. at 17-18.) Neither complies with the settlement's express terms, which require AMA's supplemental documents to be accepted. Even in the absence of the express provisions, both the covenant of good faith in the settlement and proper exercise of the trial court's equitable powers require AMA's entire claim be reviewed.

These were not the only incorrect findings in the court below. The trial court also permitted, without analysis, the claims administrator to require AMA to submit more than exemplar detailed transactional records evidencing AMA's trades with RFEDs. (SPA 1-3, 4-5, 14-20.) This meant that AMA needed one-for-one statements matching millions of trades. (*Id*.) The trial court also approved a supposed requirement that AMA somehow show its trades with RFEDs were back-to-backed with defendant banks, even though class counsel said that information was available only through subpoena. (*Id*.; *see also* Vol. 4 JA 916.)

These determinations violate AMA's due process rights and the underlying settlement. Due process is incorporated into Federal Rule of Civil Procedure 23 to protect unnamed class members from giving up their claims without participating in the underlying case and proper compensation. The evidence requested ignores the proper evidentiary standard mandated by due process, disallows secondary forms of evidence like exemplars, and makes the process unduly burdensome given that AMA did not have the power to subpoena RFEDs records. *See*

Settlement Administration, Ann. Manual Complex Lit. § 21.66 (4th ed.). These

requirements also ignore the plain language of the claim form (Vol. 11 JA 2698-

705), which asks claimants merely to submit transactional records with RFEDs but

has no requirement claimants prove that the RFEDs transacted with banks. Even

so, there is extensive evidence that the RFEDs AMA traded with in turn back-to-

backed trades with defendants. (*See* § III.A.2 below.) This satisfies the settlement,

and AMA's trades should be accepted.

The trial court also invalidated AMA's outstanding claims because AMA

submitted some of the same trades in the parallel FOREX case and supposedly

refused to identify them. (SPA 18.) That is incorrect, and there is no support for

the court's ruling. And while the trial court did not acknowledge it, AMA

explained in sufficient detail which trades with *Contant* venues were accepted in

FOREX and offered to withdraw any from FOREX that were accepted here. (Vol.

1 CA 168.) This should not invalidate AMA's claim, and there is no other reason

to affirm.

To the extent AMA does not have an independent right to appeal, the trial

court also improperly rejected AMA's motion to intervene. (SPA 6-8.) AMA has

standing to appeal either way.

## Argument

### I.    Standard of Review

A court of appeals reviews a district court's "interpretation of a settlement agreement *de novo*" even in a class action. *Riedinger*, 423 F.3d at 148.

This Court reviews "the district court's construction of legal standards *de novo*, [and] the district court's application of those standards for whether the district court's decision falls within the range of permissible decisions. [citations.]" *In re Petrobras Sec.*, 862 F.3d 250, 260–61 (2d Cir. 2017).  To the extent there was some factfinding, which did not appear to happen here, appellate courts review "that finding for clear error."  *Id*.

This court reviews a ruling on intervention for abuse of discretion. *New York News, Inc. v. Kheel*, 972 F.2d 482, 485 (2d Cir. 1992).

### II.    The Settlement Agreement Required the Claims Administrator to Consider all of AMA's Submissions

The settlement agreement is a contract determining its parties rights. The settlement agreement entitled class members like AMA to submit claims and have them reviewed by the *claims administrator* for deficiencies before rejection. After a proposed rejection, class members can respond and provide supporting documentation within twenty days.

This process was not applied to AMA's claim, despite AMA meeting the deadlines. Substantial portions of AMA's claim remain unreviewed. AMA submitted a claim with supporting documents to the claims administrator on July 16. On August 13 AMA received its first and only claim assessment from the claims administrator. Within twenty days, AMA provided information and additional documents to cure purported deficiencies.

Class counsel and ultimately the court below decided that documents submitted after July 16 could be ignored, misreading the settlement's cure provision. But the express settlement terms, the implied covenant of good faith, and the district court's equitable powers require all of AMA's submissions be considered and included in its claim.

## A.    The Settlement's Express Terms Require Reviewing AMA's Entire Submission

The settlement requires that "[p]rior to rejection of a proof of claim and release form, the Claims Administrator shall communicate with the claimant in order to remedy the curable deficiencies in the proofs of claim submitted. The Claims Administrator shall notify, in a timely fashion and in writing, all claimants whose proofs of claim it proposes to reject, in whole or in part, setting forth the reasons therefore, and shall indicate in such notice that the claimant whose claim is

to be rejected may seek review by the Court as provided below." (Vol. 9 JA 2114-15 § XI.(d)(iv).)

The settlement's very next paragraph, which "provided below" refers to, explains that "[i]f any claimant whose claim has been rejected, in whole or in part, desires to contest such rejection, the claimant must, within twenty (20) days after the date of mailing of the notice required in subparagraph 11(d)(iv) above, serve upon the Claims Administrator a notice and statement of reasons indicating the claimant's grounds for contesting the rejection *along with any supporting documentation*." (*Id*. § XI(d)(v) [emphasis added].)

The *Contant* settlement, like any other agreement, is subject to contract interpretation principles. *Riedinger*, 423 F.3d at 149. Under New York law, which governs the settlement (Vol. 9 JA 2127 § XVI.(h)), courts are required to give meaning to support its purpose—here proper compensation to class members. *See Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (App. Div. 1996). As New York courts explain, "[e]ffect and meaning must be given to every term of the contract" and intent should be "ascertained" by reviewing the "document as a whole." *Id*. "[R]easonable effort must be made to harmonize all of its terms" and "the contract must be interpreted so as to give effect to, not nullify, its general or primary purpose." *Id*. [internal citations omitted].

Here the two claim and cure provisions should be read together; the first paragraph specifically incorporates the second "as provided below," to give meaning to all their terms. There are a few requirements. The claims administrator (no other party is specified) must identify curable deficiencies. It must identify them all, because the agreement requires the proposed rejection to set "forth the reasons therefor." The claims administrator must notify the claimant in writing of these deficiencies. The claimant then has twenty days to respond, including an opportunity to provide additional supporting documents.

The only way to reasonably harmonize these terms, as contract principles require, permits the claimant to have a complete written list of curable issues, documentary or not, and a set time to resolve them. This interpretation meets the general contract principles, requiring "the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency." *Terwilliger v. Terwilliger*, 206 F. 3d 240, 245 (2nd Cir. 2000).

If the claims administrator failed to identify all deficiencies, a claimant would not have a reasonable chance to cure all defects. And if, for some reason, there was no ability to present additional "supporting documents" after the written notice, only non-documentary issues could be cured. That makes little sense.

The agreement identifies "supporting documents" without limitation. If a claimant could rely only on the documents previously provided, the "supporting

documents" language is superfluous. The settlement could just have told the claimant to respond to the rejection with a statement of reasons because the claims administrator already had previously submitted documents. Supporting documents, therefore, must mean additional documents responding to the rejection.

This proper reading of the cure provision requires AMA's complete submission be considered by the claims administrator, not just the documents submitted on July 16. The first and only communication—written or not—from the claims administrator identifying AMA's supposed deficiencies was the August 13 claim assessment.  (Vol. 1 CA 7-87.) This is the only document meeting the express requirement of the provision that the *claims administrator* identify curable deficiencies. (*Id.*)

The assessment specifically stated, as required by the settlement, that AMA had twenty days to respond to the rejection and provide supporting documents. (Vol. 1 CA 23.) AMA did so, submitting documents on August 26 and September 2, before the deadline. (Vol. 1 CA 61-69; Vol. 2 CA 287-88, 297-301.) Yet those documents were never considered. (Vol. 1 CA 162.) This defies the express settlement term, read properly, allowing supporting documents to respond to identified problems.

By denying AMA's claims, the court below agreed with class counsel's misinterpretation of the settlement agreement that supporting documents

responding to the claim assessment need not be reviewed. (SPA 17-18.) It found that the informal discussions with class counsel about documentation constituted communications "with AMA to remedy the curable deficiencies." (*Id*.) It then found the twenty-day notice and cure period to be like the "functional equivalent of a motion for reconsideration," and did not permit new supporting documents. (*Id*. at 18.)

The district court's interpretation, however, does not harmonize with or utilize all the express terms. It somehow breaks up the cure provisions, which should be read together, into an informal cure process and reconsideration. Doing so, however, subjects the cure provision to inconsistencies and superfluous language. General contract principles require rejecting this interpretation, and instead mandate the inclusion of AMA's post July 16 submissions.

Two key issues highlight problems with the district court's order. The district court conflates class counsel and the claims administrator, in defiance of the settlement's express terms. (SPA 17.) The district court also effectively denied AMA the opportunity to respond to deficiencies *first* identified in the claim assessment. (SPA 17-18.)

First, the district court's finding defies the express settlement term requiring the *claims administrator* to communicate deficiencies. There is no wiggle room. The settlement states that the claims administrator "*shall* communicate with the

claimant." (Vol. 9 JA 2114 § XI.(d)(iv) [emphasis added].) The settlement clearly

identifies the "Claims Administrator" as Heffler Claims Group (now Kroll). (*Id*. at

2090 § II.(f).) "Class Counsel" is separately defined as Berger Montague and co-

counsel. (*Id*. at 2090 § II.(h).) Class counsel, therefore, cannot stand in for the

claims administrator.[9]

   AMA's only substantive communication from the claims administrator was

the August 13 claim assessment. (*E.g.*, Vol. 1 CA 7-87, 132-41.) Prior to that, the

claims administrator was copied on some emails with class counsel, but did not

communicate or participate in any discussions. (*Id*.)[10] This should be the beginning

and end of this issue. The district court's failure to follow the settlement's express

term requires reversal of the order below.

---

[9] There is no reason to conflate counsel and the administrator.  Class counsel
represents the class and class members (Vol. 11 JA 2653), and its communications
are client assistance. The claims administrator is supposed to handle claims,
carrying out specific duties identified in the settlement.  (*E.g.*, Vol. 9 JA 2106-17
§§ VII, XI.)

[10] AMA relied on counsel's representation that no decision had been made
on its claim. (*E.g.*, Vol. 1 CA 24-26, 36-39.) That's why AMA's July 16
submission asked to "receive a complete explanation 'setting forth the reasons' for
the rejection, identifying any curable deficiencies and the remedy." (*Id*. at 60.)
Neither class counsel nor the administrator responded that AMA's understanding
was incorrect, all reasons for denial had been provided, or AMA would be unable
to cure with more documents.

Second, the trial court's "reconsideration" interpretation prevented AMA from responding to previously unknown deficiencies raised in the August 13 assessment. This defeats the purpose of the cure term.

The first and only time AMA received a comprehensive list of potential deficiencies was the August claim assessment. (Vol. 1 CA 7-87.) The general refrain from class counsel before that was that if AMA really was as high volume a trader as it purported to be, AMA should know what documents were necessary. (Vol. 11 JA 2777.) Counsel and AMA discussed potential supporting documentation as well as questions about using certain software, fees on statements, and trades made in FOREX. (Vol. 1 CA 24-54.) AMA only once received an example of a proper supporting document. (*Id*. at 46.) These questions and comments do not meet the settlement's express requirement to identify all curable deficiencies.

Even if they did, the August 13 claim assessment came up with new ones, for the first time specifically laying out the following issues[11]:

1.      A statement with individual trades must support each claimed trade. (Vol. 1 CA 7-23.) Prior to this definitive statement class counsel had said that "no decision has been made about whether less than all transactional data will suffice

---

[11] As explained in the next section, AMA disputes that these are requirements for a valid claim.

to support a claim" (Vol. 1 CA 37) and "we require exemplars of AMA's account and/or trade statements." (Vol. 1 CA 46.)

2.      FIX messages are required to support certain ███████████ trades. (Vol. 1 CA 19.) Class counsel previously said FIX messages were not helpful. (*E.g.*, Vol. 1 CA 44.)

3.      Some documentation regarding ███████████, and potentially ███████████ was needed to show that trades were made with those RFEDs and that those RFEDs back-to-backed trades with defendant banks. (Vol. 1 CA 10-11, 16-19.) Prior to that class counsel said generally that only detailed transactional statements, like the ████████ statement, were required. (*Id*. at 46.)

4.      AMA's use of prime brokers does not reflect margin trading, and could disqualify a trade. (Vol. 1 CA 10-11, 16-19.) Neither issue had been raised as a barrier before.

That the claim assessment identified new supposed deficiencies further supports the proper interpretation that AMA should have twenty days to respond with documents, including new ones. As courts have consistently explained, because AMA "had no voice in the selection" of the settlement's language, any doubt or ambiguity should be construed against class counsel as the drafter. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (App. Div. 1985); *McCarthy v. Am. Int'l Grp., Inc.*, 283 F. 3d 121, 124 (2nd Cir. 2002). This principle should be

strongly applied "as long as the particular interpretation would not lead to an absurd result." *William A. White/Tishman E., Inc. v. Banko*, 566 N.Y.S.2d 628, 402 (App. Div. 1991). There is nothing absurd about permitting a class member to respond to curable deficiencies raised in the claim assessment.

## B. The Implied Covenant of Good Faith and the District Court's Equitable Powers Also Support Reviewing the Entire Submission

The express terms are not the only reason to include AMA's post July 16 submissions. The implied covenant of good faith similarly supports reviewing AMA's additional documents. This covenant is present in class action settlements. *Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F.Supp.2d 440, 448 (S.D.N.Y. 2004). It "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id*. (citing Restatement (Second) of Contracts § 205, cmt. a (1981)).

Good faith and fair dealing means the claims administrator was "obligated to take reasonable steps to give [] claimants the opportunity to correct the deficiency in their claims." *Dahingo*, 312 F.Supp.2d at 448. New York's highest court has found that a similar failure breaches the covenant of good faith. *Dalton v. Educational Testing Svs.*, 87 N.Y.2d 384, 293-94 (1995).

Indeed, the claims administrator's bad faith may be inferred from inaction. *Dahingo*, 312 F.Supp.2d at 448. Here that could be the administrator's failure to

(1) identify all curable deficiencies before August 13, (2) review AMA's post July 16 submissions, or (3) tell AMA that it would not be permitted to provide additional supporting documents after July 16. AMA asked about the cure deadline, but neither class counsel nor the administrator indicated that curing under section XI with additional documents would be denied. This violates the settlement's purpose, and the simple correction of analyzing AMA's additional submissions should be required.

The trial court's equitable powers alternatively should have been used to require review of documents submitted after July 16. While "courts do not generally have the authority to modify [settlements] on the basis of equitable principles alone," they "do have the equitable power to allocate the proceeds of a settlement fund among class members insofar as it does not alter the liability of the defendant." *Dahingo*, 312 F.Supp.2d at 448. And they can "modify terms of a settlement agreement that were not the product of negotiation and compromise by the parties." *Id*. Here the trial court should have given AMA more time to respond to any deficiency. Acceptance of late claims is tied only to a "material delay" in settlement distributions. (Vol. 9 JA 2113-14 § XI(d)(ii).) Properly analyzing AMA's claim for a few months in 2021, when it did not get original notice of the settlement, is not a material delay for a four year old case, as the district court recognized in permitting AMA's late claim. (SPA 1-2.) The ability to get it right

should be paramount to the trial court's decision, and it would be inequitable for AMA to release its claims potentially worth millions without anyone reviewing the documentation it submitted to perfect those claims. This inequitable result is a misapplication of the trial court's inherent power.

The trial court's finding should be reversed, with directions that AMA's post July 16 submissions be included in its claim. Permitting review of these additional submissions, without even addressing the evidentiary issues below, requires accepting trades in six ███████ statements and one month of ███████████ FIX messages. (*Compare* Vol. 1 CA 15, 19; Vol. 2 CA 287-88 ¶ 3, 298-99.)

## III. AMA's Due Process Rights Were Violated by Applying Improper Evidentiary Standards

AMA, like all class members, had antitrust claims against the defendant banks. Those claims, which could be extinguished here with little compensation, are property that is protected against arbitrary deprivation by the Due Process Clause. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). That protection is especially important in class actions, where unnamed class members like AMA can have rights stripped without participating in the underlying case and without direct notice. Due process is why protections for (b)(3) class actions were established. The Advisory Committee notes in the seminal 1966 revision to Rule 23 make clear that the rule is "subject" to due process.

That is why this Court has for fifty years found that a "narrow view" of the court's function to protect unnamed class members should be rejected. *Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir. 1972). Trial courts have "inherent power and duty to protect unnamed, but interested persons." *Id*. They are "akin to 'wards of the court,'" and should be treated accordingly. *See id*. Due process is satisfied only when the court enacts a "reasonable procedural or evidentiary rule." *Logan*, 455 U.S. at 437. That did not happen here.

Instead the district court permitted class counsel and the administrator to employ evidentiary standards inconsistent with Rule 23. (SPA 1-5, 14-20.) Even if AMA's additional cure period submissions are not considered, AMA's exemplars and other documents adequately support the entire claim. Moreover, due process cannot require that AMA, a claimant without subpoena or other discovery powers, submit evidence that class counsel admitted was available only from RFEDs by subpoena. The matter should be remanded with directions to use the correct evidentiary standard discussed below.

## A. The Proper Evidentiary Standard to Analyze Claimants' Claims

Keeping the due process framework in mind, the trial court can still look to the settlement agreement for guidance on an acceptable claim. Here claimants must submit a proof of claim under penalty of perjury, "supported by such documents or proof as Class Counsel and the Claims Administrator, in their discretion, may

deem acceptable." (Vol. 9 JA 2113 § XI.(d)(i).) The claim form, approved by the district court, explains that Option Two claimants like AMA can submit their own detailed transactional records for calculating an award. (Vol. 11 JA 2700-05.) The only limitations are that "you have records reflecting your transactions with RFEDs or other eligible entities" and you submit them. (*Id*.) Those records must be "detailed transactional records (e.g., account statements and transaction confirmations)" as well as an Option Two Claim Form Spreadsheet. (*Id*.) The claimant also certifies that it entered into the transactions. (*Id*.)

Both the claim form and common law make clear the discretion given class counsel and the administrator is not absolute. "Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that is to be exercised in good faith." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F. 3d 1570, 1575 (2nd Cir. 1994). That should be even more evident here where AMA, or any other claimant, is a beneficiary to an agreement it did not negotiate yet requires it to release substantial rights. That's because the "particular duties…are derived both from the common expectations of [the] parties … and from the relationship of those parties as structured by the contract. [internal quotes and cites omitted]." *Id*.

Class counsel was appointed by the court "to represent you and the other members of the Settlement Classes." (Vol. 11 JA 2653.) The reasonable

expectation from the relationship is that class counsel would help claimants validate claims in objective and fair manner. That's confirmed by class counsel telling AMA that we will "do our best to help you." (Vol. 1 CA 25.)

The objective evidentiary standard for this case must incorporate the due process rights of unnamed class members. FED. R. CIV. P. 23 Advis. Comm. 1966 Amendment. As the Advisory Committee explained, while "[a] claims processing method should deter or defeat unjustified claims, [] the court should be alert to whether the claims process is unduly demanding." FED. R. CIV. P. 23 Advis. Comm. 2018. In the same revision, the Advisory Committee warned to avoid "inequitable treatment of some class members vis-a-vis others" including "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Id.*

Here at least two misapplications of these standards violated AMA's due process rights—the "one for one" statement requirement and the need for AMA to show certain trades were back-to-backed with defendant banks.

## 1. The one for one statement requirement was improper

These basic due process tenets result in a leading treatise supplying the proper evidentiary standard for class claims. "Completion and documentation of the claims forms should be no more burdensome than necessary. Nor, for purposes

of administering a settlement, should the court require the same amount and specificity of evidence needed to establish damages at a trial; secondary forms of proof and estimates are generally acceptable." Settlement Administration, Ann. Manual Complex Lit. § 21.66 (4th ed.). This standard was not employed here.

Instead of utilizing these proper elements, like summaries, estimates or exemplars, the claim assessment contends that there must be a statement for every trade. (*E.g.*, Vol. 1 CA 15.) That requirement was unduly burdensome for AMA (and likely other claimants), especially for the July 16 deadline. By that time, AMA gathered exemplar statements and trade confirmations (in the form of FIX messages) to prove that trades on the claim form were valid. (Vol. 1 CA 55-60.)

Because AMA is small, yet was a large volume trader during the class period, its revised July 16 submission included ▮▮▮▮▮ of trading months and almost ▮▮▮▮▮ trades. (Vol. 1 CA 119 ¶ 1; Vol. 2 CA 296-301.) AMA's claim spreadsheet (populated from its SQL database) identified AMA's claimed trades, including the date, currency pair, volume, and venue, and the claim form certified AMA made them. (Vol. 1 CA 119 ¶ 7; Vol. 2 CA 296.) To further show the veracity of AMA's claim, AMA also submitted thousands of pages of documents, including agreements with venues, multiple months of statements, correspondence with venues, and FIX message trade confirmations at the cost of hundreds of hours and tens of thousands of dollars. (Vol. 1 CA 117-24; Vol. 2 CA 297-301.)

Exemplars are more than enough to meet the evidentiary standards mandated by due process. The claim assessment and class counsel offered no reason to think that trades at a venue in one month were valid, while trades during another were not. Exemplars supply enough information to show whether trades with a particular venue qualify for the settlement. That was likely why on July 1 class counsel stated that "to validate AMA's claim, we require exemplars of AMA's account and/or trade statements for the Relevant Time Period for each account for which AMA is making a claim." (Vol. 1 CA 46.) Additional records will not affect the determination whether the trades meet the class definition. If the exemplars meet the class definition, the rest should too. Anything more is unnecessary.[12]

This, of course, is exactly what happened in the $2 billion FOREX case. AMA was required to submit merely four months of FIX messages at several venues as exemplars. (Vol. 1 CA 134.) *Contant* does not need more.

The district court, however, accepted class counsel's argument that one-for-one statements were required. (SPA 2.) That ruling makes little sense. The court below explained that "detailed transactional records are necessary 'for purposes of

---

[12] Class counsel cannot point to the claim form for the one-to-one requirement either. The form says the detailed transactional statements must be submitted. (Vol. 11 JA 2698-705.) It does not say that there must be one for every trade. AMA submitted detailed transaction records as exemplars for every venue at issue on July 16 supplying many more records by September 2. This meets any supposed claim form requirement and satisfies the evidentiary standard permitted by due process.

calculating [claimants'] pro rata award." (*Id*.) But class counsel's expert, Dr. Janet Netz, needs only the currency pair, price, date, and volume to calculate the award. (Vol. 9 JA 2141-43.) This information is in the claim spreadsheet. (Vol. 2 CA 296.) Additional records merely support that AMA was in fact a high volume trader with the particular venues during the class period—exemplars alone supply that. The district court's one-for-one ruling should be reversed.[13]

## 2. The court below improperly required AMA to document that trades with venues were back-to-backed with defendant banks

The next due process issue arises from the settlement's foundation where the settlement class, the underlying evidence, and release do not seem to firmly align. Class counsel settled this indirect antitrust case for a broad class—anyone in several states that made foreign currency trades during the class period that were back-to-backed to a trade with a bank. (Vol. 9 JA 2097-2102.) Other than being with a FOREX class member, which class counsel has not asserted is an issue here, there was no limitation on the venues included. (*Id*.) Yet class counsel obtained and utilized evidence of allegedly improper trades from only four RFEDs (the "Option One RFEDs") out of more than *sixty* subpoenaed, despite asserting that only RFEDs had this information. (Vol. 4 JA 852-97, 915; Vol. 8 JA 1929-30,

---

[13] To the extent the Court finds that AMA's post-July 16 submissions should be reviewed, AMA submitted venue-issued statements with trade-level detail for most trades still at issue. (Vol. 2 CA 297-301.)  So this may not ultimately matter.

1954-44, 1967; Vol. 11 JA 2698-706.) This means that Option Two claimants, not in the Option One RFEDs' records, could have an unfair burden to prove claims while giving up the same rights as Option One claimants. AMA provided detailed transactional statements showing trade level detail with the RFEDs at issue. (*E.g.*, Vol. 2 CA 296-301.) This should satisfy the claim requirements.

Yet the claim assessment seems to require AMA to independently document that certain RFEDs, including the venues still at issue— ████████████████, and ████████, back-to-backed AMA's trades with defendant banks. (Vol. 1 CA 12, 17-20.) It states that "[a]bsent information provided directly from an RFED, such as that obtained by Class Counsel from certain RFEDs, it is necessary for claimants to demonstrate that the FX transaction was made with a qualifying counterparty to constitute a valid indirect transaction that satisfies the Definitions of the Settlement Classes." (*Id*. at 10.) And without explanation, the court below agreed that AMA did not supply sufficient information. (SPA 4-5.)[14]

This determination violated AMA's due process rights and did not comport with the evidentiary standards applicable under Rule 23. AMA, and all Option

---

[14] The court below approved class counsel's no documentation argument (and the claim assessment's finding) without explanation or analysis. (SPA 4-5, 14-20.) The court below did not rule whether the statements submitted were detailed transactional records nor what actual evidence was required to satisfy the settlement. (*Id*.) This was error. This unsupported determination violates the settlement's dispute resolution term and Article III. *Cf. Burlington N. R. Co. v. Dep't of Revenue of State of Wash.,* 934 F.2d 1064, 1074 (9th Cir. 1991).

Two claimants, should not have to prove something that class counsel believes could be determined from documents available only through a subpoena. Rule 23's 2018 Advisory Committee notes recommend that settlements like this one account for the differences in claimants' claims and the effect of the release, and should tailor the claims.

Option One claimants, who class counsel obtained records for, had no duty to show their claims were back-to-backed. (Vol. 11 JA 2698-705.) Had class counsel settled just for those class members, there would be no due process violation. But because class counsel expanded the class to include all RFEDs, class members without the benefit of class counsel's discovery to prove their claims were required to give up the same rights.

It appears, regardless of the claim assessment, that the settlement made a conscious decision not to require this information for Option Two claimants. While the class definition includes trades made with venues that were back-to-backed with banks (Vol. 9 JA 2098), the claim form does not ask for this information. (Vol. 11 JA 2698-705.) The form requests records of transactions with RFEDs—it does not state that documents showing those RFEDs transacted with defendants are necessary too. (*Id.*) This makes sense because the case was based on highly concentrated FX market conditions. As class counsel explained in opposition to the banks' motion to dismiss, "because Defendants collectively

dominate more than 90% of the market, SCCAC ¶ 93, it defies logic to suggest that every single spot FX transaction by Plaintiffs and Class members—most of whom transacted hundreds if not thousands of spot FX Instruments during the Class Period—involved a non-Defendant liquidity provider." (Vol. 3 JA 669-70, *see also* Vol. 3 JA 755-56 ¶¶ 91-93.) Class counsel should have definitively known which RFEDs back-to-backed trades (and supplied evidence in the trial court), obtained the information in discovery, settled the case only at venues where it obtained records, or relied on the market conditions to supply the evidence.  Burdening only Option Two claimants with this back-to-backed "requirement" therefore violates due process (and the express claim form term).  Because AMA provided its trade level statements with RFEDs, those trades should be given credit.

Even though it should not be required, there is also circumstantial and direct evidence showing that AMA's trades with ███████████████████████████ ██ were back-to-backed with defendant banks. The most obvious is that FOREX class counsel rejected trades with these venues. (Vol. 1 CA 129.) Rather than agreeing these venues allowed AMA to directly trade with defendants, she explained that "Defendants on these venues traded with the venue, not with the venue's clients. The clients are considered 'indirect' on these platforms." (*Id.*) AMA's other evidence is venue-specific:

██████. ██████ is an RFED, just like the Option One RFEDs, which class counsel confirmed in interrogatory responses. ████████████████████

████████████████████████████████████████████████████

██████ AMA was an ████████████████ customer. (Vol. 2 CA 298.) ██████ CEO declared in another case that ██████ trades during the class period were directly made with institutional clients like AMA and back-to-backed with three defendant banks. (Vol. 2 CA 332-33 ¶¶ 5-6.) ██████ operated ████████ [] for its institutional clients as part of its 'A-Book' business. Once an 'A-Book' client entered into a trade with ██████, ██████ would simultaneously enter into an offsetting transaction in its own name with a liquidity provider for the exact same currency pair and volume." (*Id*.) That is exactly the class definition. (Vol. 9 JA 2098.) The liquidity providers were defendants Credit Suisse, The Royal Bank of Scotland, and BNP Paribas, and "██████ profited from a set markup on each A-Book transaction." (Vol. 2 CA 332-33 ¶¶ 5-6.)

████████████████. ████████████████ is an RFED (Vol. 1 CA 20, 32 [citing ██████ article]), just like the Option One RFEDs and the claim assessment accepted trades with it. (*Id*. at 19.) ████████████████' "Risk Disclosure Statement For FOREX Trading" states that "The foreign currency trades you transact are trades with the [] retail foreign exchange dealer as your Counterparty. WHEN YOU SELL, THE DEALER IS THE BUYER. WHEN YOU BUY, THE

DEALER IS THE SELLER."[15] We also know that those trades are back-to-backed with liquidity providers like defendants. ███████████ discloses that "To execute your order, ███████████ engages in back-to-back transactions with one or more counterparties."[16] AMA submitted FIX messages where, for a brief period, ███████████ trade confirmations to AMA accidently identified the defendant banks that back-to-backed trades.[17] (Vol. 1 CA 19; Vol. 2 CA 300.) The claim assessment agreed. (Vol. 1 CA 19.) There is no indication that ███████ ███████ practices changed, so all ███████████ trades should meet the class definition.[18]

███████. ██████████████████████████████ ███████████ platform to conduct trades "on prices provided by one or more

_____

[15] ███████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

[16] *Id*. § 1.

[17] Providing FIX messages for ███████████ should not be a requirement for inclusion in the settlement. The ███████████ statements have the same information as the accepted trades for ███████████, requiring additional supporting FIX data for ███████████ alone makes no sense. (Vol. 1 CA 289-95.)

[18] It would be manifest injustice to give AMA no recovery on these trades at a venue the assessment already accepted. If for some reason the Court is not convinced that every trade is back-to-backed with a defendant, it should direct the trial court to craft a discount just like the same judge approved for anonymous ECNs in the FOREX matter. (FOREX Plan of Distribution at 28 [http://www.fxantitrustsettlement.com/docs/PlanofDistribution.pdf].)

third-party bank providers (each a 'Liquidity Provider')." (Vol. 1 CA 105.) AMA's

 agreement confirms that "tradeable prices" include "the mark-up" that

may receive as compensation. (*Id*. § 3.2.) This means that is trading

with its clients at prices different than it is getting from liquidity providers. As a

2009 press release explains,

[19] This means that every

(Vol. 3 JA 593-94

¶¶ 3,4-6, 776-792 ¶¶ 147-189; Vol. 9 JA 2098.) There is nothing that prevents

from being an Option Two RFED.

Regardless of whether and to what extent AMA can be required to

independently document the back-to-backed element of the class definition, the

evidence sufficiently shows that the trades meet it.

---

[19] *See also* Vol. 1 CA 31.

Furthermore, the claims assessment's requirement that AMA submit additional back-to-backed evidence for ███████████████████████████ is inconsistent with other AMA trades that were accepted. The claim assessment accepted ███████████████ trades without any additional back-to-backed information. (Vol. 1 CA 15, 20.) AMA's statements with ██████████████ ███████████████████████████ all contain the same trade level information (individual trades with currency pairs, volumes, prices)—so they all must be detailed transactional records supporting a valid trade. (Vol. 2 CA 289-95.) This is yet another reason all trades with these venues should be accepted.

Both the finding that AMA should have to show trades it made with the disputed venues were back-to-backed with banks and any determination that there is no support of that fact are wrong. This Court should reverse and remand with directions to validate AMA's trades with all ████ venues.

**B.      Making Claims in *Contant* and FOREX Does Not Prevent Recovery by AMA**

On reconsideration, the district court alternatively denied AMA's outstanding claim for failing to properly document trades submitted both in *Contant* and FOREX. (SPA 18.) There is no support for this in the settlement and the trial court offered no reasoning either. The district court merely explained that the "claims belong either in the FOREX class settlement as direct trades, or the

settlement here. AMA is not entitled to duplicate recovery on any claim, as the settlement classes and covered transactions in the two cases are mutually exclusive." (*Id.*) While AMA agrees that it should not be entitled to duplicate recovery, this does not justify denying AMA's claims.

AMA offered to withdraw from FOREX any claim that for some reason was also accepted in *Contant* since it appeared distribution in *Contant* would occur first and be more beneficial to AMA. (Vol. 1 CA 168.) The court below did not acknowledge this offer, and appears to have similarly ignored that AMA generally identified the trades provisionally accepted in FOREX. (SPA 18.)

This problem occurred in part because class counsel agreed that both cases accept indirect claims, so AMA submitted some of the same claims in both. (Vol. 1 CA 136.) As AMA explained in several filings, it is very difficult to quickly identify precisely which of its claimed *Contant* trades were preliminarily accepted in FOREX, because the claim forms were different and the preliminary notice in FOREX was incomplete and poorly formatted. (*E.g.*, Vol. 1 CA 168; *see also id.* at 66, 114.) AMA instead identified the venues where trades were generally accepted or rejected in the two cases, and was (and is) willing to assist the claims administrator in more specifically identifying duplicate trades. (*Id.*)[20]

---

[20] FOREX rejected "Venues" of ███████████████████ ████████████████ because they are indirect. (Vol. 1 CA 129.) FOREX indicated that, relevant here, ████████████████ were accepted. (*Id.* at

It should not matter to the *Contant* claims process though; a trade is valid whether it was submitted elsewhere and because AMA agreed to withdraw any duplicative trade from the other case. This cannot result in a "no documentation" denial. AMA's offer to withdraw coupled with the information provided—a usable summary—meets the proper standard for evidence here. The Court should instruct class counsel and the district court to complete review of AMA's full submission and identify accepted trades. AMA will then withdraw any trade from FOREX accepted here.

### C.    AMA's Use of Prime Brokers Is Not a Reason to Affirm

In the court below, class counsel asserted that using prime brokers to clear trades pushed those trades outside the class definition. (Vol. 1 CA 4-5.) While the trial court asked for additional briefing on this point, it never ruled. (SPA 3.) The court below found that other documentation issues required denial. (SPA 4-5.) This Court cannot affirm the denial on the prime broker issue because these trades meet the class definition.[21]

---

168.) There was some confusion because some, but not all, of AMA's ████ trades were claimed in FOREX with a "Venue" of ████████" but in *Contant* with an "RFED" of ██████████████ (*Id.*) Most ████████ trades were preliminarily accepted by FOREX. (*Id.*)

[21] To the extent the Court finds that prime broker trades are not part of the settlement, there were several non-prime broker trades with ████████ and ██████████████████ that were rejected on other improper grounds. These trades, assuming the Court agrees the other documentation denials were improper, should be approved regardless of any prime broker issue.

A prime broker provides two services: credit and aggregation. (Vol. 1 CA 122-24 ¶¶ 10-14.) Neither interferes with the validity of AMA's indirect claims here. Class counsel's position that prime broker trades are invalid, adds unwritten requirements to the class definition that the initial trades cannot later be cleared using a prime broker. (Vol. 9 CA 2098.) If *Contant* wanted to exclude using prime brokers from the class definition, it could have done so. Because it did not, claimants (like AMA) that use prime brokers have valid trades.

A prime broker merely allows AMA to trade with several venues, without individually establishing credit or holding currency with each. (Vol. 1 CA 122-24 ¶¶ 10-14, 143-45, 170-255; Vol. 2 CA 256-76.) AMA's prime broker agreements generally explain this relationship. The ███████████ agreement, for example, makes clear that AMA is trading directly with the venue first. It explains that ███ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ (Vol. 1 CA 172-73 § 2.(A).) ██████████████████████████████████████████████ ████████████████████████████████████████ (*Id*. at 172 § 1.) ████████████████████████████████████████████ (*Id*. at 213-14 § 2; Vol. 2 CA 259 § 2.1.)[22]

---

[22] Prime broker arrangements are sometimes described as either "give up" or "agency" relationships. In practice they are the same. In the "give up" context the agreement usually states that the customer makes trades with venues in its own

AMA provided the court below a side-by-side example showing that there's no effective difference to trades with and without a prime broker. (Vol. 1 CA 143-45.) On September 14, 2010, AMA made trades with the same venue about two hours apart one with and one without a prime broker. (*Id*.) The trades appear consecutively in the "Trades" section of AMA's statement with the same information. (*Id*.) For the trade using the prime broker, there is another step. In the "Outgoing Trade Transfers" section of the statement—three minutes after AMA entered into the trade with the venue—there is a line item reflecting a ███ ███ Prime Broker transfer. (*Id*.) These almost identical interactions show that AMA entered into both trades with the venue—meeting the class definition.

All the cited authorities agree that using a prime broker does not eliminate the initial transaction between AMA and the venue. The New York Federal Reserve explains that—when using a prime broker—step one is "Client trades with executing dealer." (Vol. 1 CA 91.) The Foreign Exchange Committee also explains four times that, regardless of the prime broker, trades begin with "the prime broker's client" like AMA "execut[ing] trades with several executing dealers." (Vol. 11 JA 2782-85.) For the related market of FX swaps, the CFTC found the

---

name that are given up to the prime broker. In the "agency" context, the customer makes trades with the venue as an agent for the prime broker, so that the prime broker can effectuate the transfer of the trade. The customer still makes and pays for the trade, and to the customer and the venue both scenarios have identical effect.

"market participant" like AMA is the "counterparty" to transact with "executing dealers" like RFEDs. (Vol. 1 CA 109.1-109.10.)

The FOREX claim process was consistent with this analysis. FOREX did not distinguish between trades with and without a prime broker. (Vol. 1 CA 121-24 ¶¶ 10-14.) If the counterparty for the trade was a defendant, the trade was accepted. (*Id*.) The claims here should be viewed similarly. The district court's finding cannot be affirmed on this ground.

## IV.  If AMA Does Not Have Standing to Pursue Its Appeal Without Intervention, the District Court Erred in Denying AMA's Motion to Intervene

Class counsel and the district court agreed that AMA need not intervene to protect its substantial interest in the settlement fund because, as a class member, it has independent standing to appeal under this Court's precedents. *E.g.*, *Rothstein v. Am. Int'l Grp.*, 837 F. 3d 195, 204 (2nd Cir. 2016). (SPA 6-8.) AMA agrees. To the extent this Court somehow finds AMA does not have standing, the district court's denial of AMA's motion to intervene was in error.

To the extent intervention was necessary, AMA met the requirements for mandatory or permissive intervention. Mandatory intervention requires (1) a timely motion; (2) an interest relating to the subject of the action; (3) a risk that disposing of the action would "impair or impede" the movant's ability to protect its interest;

and (4) no existing party adequately represents the movant's interest. FED. R. CIV. P. 24(a)(2). AMA was timely, seeking leave within two weeks of the district court's November 16 order denying most of its claims. (Vol. 12 JA 2877.) AMA has an interest in its share of the settlement fund, and a final ruling will extinguish any further ability to recover for defendants' misconduct. No existing parties represent AMA's interests.

The district court denied mandatory intervention only because AMA has an independent right to appeal. (SPA 6-8.) If the district court was somehow incorrect, all elements for mandatory intervention are met.

AMA also meets the test for permissive intervention, which requires (1) a timely motion; (2) a question of law or fact in common; and (3) no undue "delay or prejudice [to] the adjudication of the rights of the original parties." *Diduck v. Kaszycki & Sons Contractors, Inc.*, 149 F.R.D. 55, 59 (S.D.N.Y. 1993). The timeliness and delay factors are met for the reasons discussed above. AMA's claims—as a putative class member—necessarily share common legal and factual issues with those of the larger class. (*E.g.*, Vol. 11 JA 2665.)

The district court denied permissive intervention because AMA supposedly "fail[ed] to explain how [it has] a claim or defense 'that shares with the main action a common question of law or fact[.]'" (SPA 6-8.) But all class members have the same claims against defendants. To the extent the common question must

relate to the claims process, misinterpreting the settlement agreement applies to all claimants. If necessary, intervention is proper.

## Conclusion

For all the foregoing reasons, AMA respectfully requests that the district court's orders be reversed and remanded with directions to accept the challenged portions of AMA's claim ███████████████████████████████ ) and include the trades to calculate AMA's pro rata distribution.

DATED: March 29, 2022      PAYNE & FEARS LLP
                                       Attorneys at Law

By:       /s/ Scott O. Luskin
                SCOTT O. LUSKIN

      Attorneys for Appellant
      Local Counsel
      Damian R. Cavaleri, Esq.
      HOGUET NEWMAN REGAL
       & KENNEY, LLP
      One Grand Central Place
      60 East 42nd Street, 48th Floor
      New York, NY 10165
      Tel.: (212) 689-8808
      Fax: (212) 689-5101
      Email: dcavaleri@hnrklaw.com

# CERTIFICATE OF FED. R. APP. 32(A)(7)(B) COMPLIANCE

This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f): this document contains 13,329 words. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Time New Roman.

DATED: March 29, 2022   PAYNE & FEARS LLP
           Attorneys at Law


        By:  /s/ Scott O. Luskin
            SCOTT O. LUSKIN

         Attorneys for Appellant
         Local Counsel
         Damian R. Cavaleri, Esq.
         HOGUET NEWMAN REGAL
          & KENNEY, LLP
         One Grand Central Place
         60 East 42nd Street, 48th Floor
         New York, NY 10165
         Tel.: (212) 689-8808
         Fax: (212) 689-5101
         Email: dcavaleri@hnrklaw.com

4892-5440-4629.42