# 21-3058(L)

## 22-0019(CON), 22-0159(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

JAMES CONTANT, on behalf of themselves and all others similarly situated, MARTIN-HAN TRAN, on behalf of themselves and all others similarly situated, CARLOS GONZALEZ, on behalf of themselves and all others similarly situated, UGNIUS MATKUS, on behalf of themselves and all others similarly situated, JERRY JACOBSON,

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLEES
## [REDACTED]

ROBERT B. MCCULLEY
MCCULLEY MCCLUER LLC
701 East Bay Street, Suite 411
Charleston, South Carolina 29403
(843) 444-5404

*Attorneys for Plaintiff-Appellee
James Contant, on behalf of
themselves and all others similarly
situated*

MICHAEL DELL'ANGELO
MICHAEL J. KANE
BERGER & MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000

*Attorneys for Plaintiffs-Appellees
James Contant, on behalf of
themselves and all others similarly
situated, Martin-Han Tran, on behalf
of themselves and all others similarly
situated, Carlos Gonzalez, on behalf
of themselves and all others similarly
situated, Ugnius Matkus, on behalf of
themselves and all others similarly
situated, Jerry Jacobson, on behalf
of themselves and all others similarly
situated, Paul Vermillion, on behalf
of themselves and all others similarly
situated, Sandra Lavender, on behalf
of themselves and all others similarly
situated, Victor Hernandez, FX
Primus Ltd., Charles G. Hitchcock,
III, Tina Porter*

on behalf of themselves and all others similarly situated, PAUL VERMILLION, on behalf of themselves and all others similarly situated, SANDRA LAVENDER, VICTOR HERNANDEZ, FX PRIMUS LTD., CHARLES G. HITCHCOCK, III, TINA PORTER,

*Plaintiffs-Appellees,*

—against—

AMA CAPITAL MANAGEMENT, LLC,

*Movant-Appellant,*

BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., THE BANK OF TOKYO MITSUBISHI UFJ LTD., BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BNP PARIBAS GROUP, BNP PARIBAS NORTH AMERICA, INC., BNP PARIBAS SECURITIES CORP., BNP PARIBAS PRIME BROKERAGE, INC., CITIGROUP INC., CITIBANK, N.A., CITICORP, CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., THE GOLDMAN SACHS GROUP, INC., GOLDMAN, SACHS & CO., HSBC HOLDINGS PLC, HSBC BANK PLC, HSBC NORTH AMERICA HOLDINGS, INC., HSBC BANK USA, N.A., HSBC SECURITIES (USA) INC., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., MORGAN STANLEY, MORGAN STANLEY & CO., LLC, MORGAN STANLEY & CO. INTERNATIONAL PLC, RBC CAPITAL MARKETS LLC, ROYAL BANK OF SCOTLAND GROUP PLC, RBS SECURITIES INC., SOCIETE GENERALE S.A., STANDARD CHARTERED BANK, UBS AG, UBS GROUP AG, UBS SECURITIES LLC, GOLDMAN SACHS & CO. LLC, THE ROYAL BANK OF SCOTLAND PLC, FOREX CAPITAL MARKETS, LLC,

*Defendants,*

FXDIRECTDEALER, LLC (FXDD),

*Movant.*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ...................................................................................... 1

COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW ......... 3

STATEMENT OF THE CASE ...................................................................... 3

    I.   PRELIMINARY APPROVAL AND NOTICE TO THE
         SETTLEMENT CLASSES ............................................................... 3

    II.  FINAL APPROVAL AND CLAIMS PROCESS ............................. 5

    III. AMA'S CLAIM SUBMISSION ....................................................... 8

    IV. AMA'S MOTION TO INTERVENE IS DENIED AND THE
          DISTRICT COURT APPROVES DISTRIBUTION OF THE
          SETTLEMENT PROCEEDS ......................................................... 14

SUMMARY OF ARGUMENT ................................................................... 17

ARGUMENT ........................................................................................... 19

    I.   STANDARD OF REVIEW .......................................................... 19

    II.  AMA'S CLAIM WAS CONSIDERED CONSISTENT WITH
         THE TERMS OF THE CLAIM FORM AND SETTLEMENT
         AGREEMENTS .......................................................................... 22

         A.  The Express Terms of the Settlement Agreements Do Not
             Require Acceptance of all AMA's Post July 16
             Submissions and, even if accepted, AMA's Claim is
             Largely Defective and Does Not Materially Change the
             Outcome of the Claim Determination ...................................... 23

         B.  AMA's Interpretation of the Settlement Agreements
             Conflicts with their Plain Language .......................................... 26

i

C.  The Implied Covenant of Good Faith and the District Court's Equitable Powers Do Not Require Serial Review of AMA's Defective Claim....................................................29

III. AMA WAS AFFORDED THE PROCESS THAT IT WAS DUE......................................................................................31

A.  The Proper Evidentiary Standard Mandates Denial of the Appeal. ..............................................................................31

1.  The District Court's One-for-One Statement Requirement is Proper.......................................35

2.  The District Court Correctly Required AMA to Comply with the Court-Approved Documentation Standards. ......................................................36

B.  AMA's Refusal to Identify Duplicative Claims Supports the District Court's Exercise of Discretion. ............................44

C.  AMA's Post-July 16, 2021 Submissions Were Not Timely and AMA Was Afforded Due Process.........................46

D.  AMA's Use of Prime Brokers is Irrelevant to the Claim Determination and the District Court's Decisions. ..................52

IV. APPELLEE DOES NOT CHALLENGE AMA'S STANDING TO PURSUE AN APPEAL DESPITE ITS LACK OF MERIT .......52

CONCLUSION ......................................................................54

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*In re "Agent Orange" Prod. Liab. Litig.*,
  818 F.2d 179 (2d Cir. 1987) .................................................. 19, 31, 32

*Alaska Elec. Pension Fund v. Bank of Am., Corp.*,
  No. 14-cv-7126, 2020 WL 916853 (S.D.N.Y. Feb. 26, 2020).............. 40

*Allianz Ins. Co. v. Lerner*,
  416 F.3d 109 (2d Cir. 2005) ................................................................ 36

*Anthracite Capital, Inc. v. MP-555 West Fifth Mezzanine, LLC*,
  No. 03 Civ. 5219 (DLC), 2005 WL 1155418
  (S.D.N.Y. May 17, 2005), *aff'd* 165 Fed. Appx. 875
  (2d Cir. Dec. 20, 2005).................................................................. 29, 30

*Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*,
  945 F.3d 53 (2d Cir. 2019) ........................................................... 21, 31

*In re Auction Houses Antitrust Litig.*,
  42 F. App'x 511 (2d Cir. 2002) ........................................................... 39

*Beecher v. Able*,
  575 F.2d 1010 (2d Cir. 1978) ...................................................... 19, 32

*BNF NY Realty, LLC v. Nissan Motor Acceptance Corp.*,
  No. 18 Civ. 3664 (LGS), 2019 U.S. Dist. LEXIS 9631
  (S.D.N.Y. Jan. 9, 2019) .................................................................... 27

*Bryant v. N.Y. State Educ. Dep't*,
  692 F.3d 202 (2d Cir. 2012) ............................................................... 38

*In re Citigroup Inc. Bond Litig.*,
  296 F.R.D. 147 (S.D.N.Y. 2013) ........................................................ 41

*Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*,
  603 F.3d 169 (2d Cir. 2010) ............................................................... 24

*Curtis Pub. Co. v. Butts*,
  388 U.S. 130, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967) ..................... 37

*Curtiss-Wright Corp. v. Helfand*,
  687 F.2d 171 (7th Cir. 1982) ....................................................... 32, 44

iii

*Dahingo v. Royal Caribbean Cruises, Ltd.*,
  312 F. Supp. 2d 440 (S.D.N.Y. 2004) ............................................. 30, 31

*Doe v. Trump Corp.*,
  No. 20-cv-1278, 2021 U.S. App. LEXIS 22317
  (2d Cir. July 28, 2021) .......................................................................... 36

*FCS Advisors, Inc. v. Fair Fin. Co., Inc.*,
  2009 WL 1403869 (S.D.N.Y. May 19, 2009) ...................................... 27

*Galli v. Metz*,
  973 F.2d 145 (2d Cir. 1992) ................................................................. 27

*In re GSE Bonds Antitrust Litig.*,
  414 F. Supp. 3d 686 (S.D.N.Y. 2019) ................................................. 42

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir.1996) .................................................................... 26

*In Re Holocaust Victim Assets Litig.*,
  413 F.3d 183 (2d Cir. 2001) ................................................................. 32

*Keepseagle v. Perdue*,
  856 F.3d 1039 (2017) ............................................................................ 37

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
  233 F.R.D. 306 (E.D.N.Y. 2006) .......................................................... 41

*Nodaway Valley Bank v. Cont'l Cas. Co.*,
  916 F.2d 1362 (8th Cir. 1990) ............................................................. 22

*Paese v. Hartford Life & Accident Ins. Co.*,
  449 F.3d 435 (2d Cir. 2006) ................................................................. 36

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721
  (2d Cir. 1997) (per curiam) ................................................................. 41

*Paneccasio v. Unisource Worldwide, Inc.*,
  532 F.3d 101 (2d Cir. 2008) ................................................................. 27

*In re Payment Card Interchange Gee & Merch. Disc. Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019) ............................................................ 42

*Pena v. DePrisco*,
  432 F.3d 98 (2d Cir. 2005) ................................................................... 37

iv

*In re Petrobras Sec. Litig.*,
   862 F.3d 250 (2d Cir. 2017) ...............................................................21

*In re PPDAI Grp. Inc. Sec. Litig.*,
   No. 18-CV-6716 (TAM), 2022 U.S. Dist. LEXIS 11427
   (E.D.N.Y. Jan. 21, 2022).................................................................42

*Progressive Credit Union v. City of N.Y.*,
   889 F.3d 40 (2d Cir. 2018) ................................................................38

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010)................................................27

*Rosa R. v. Connelly*,
   889 F.2d 435 (2d Cir. 1989) ..............................................................37

*Rothstein v. American International Group, Inc.*,
   837 F.3d 195 (2d Cir. 2016) ........................................................24, 53

*Sathianathan v. Smith Barney, Inc.*,
   No. 04 Civ 7122 (DAB) (FM), 2006 WL 538152
   (S.D.N.Y. Feb. 24, 2006) ..................................................................30

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011) .................................................42

*Sheth v. New York Life Ins. Co.*,
   273 A.D.2d 72 (1st Dep't 2000) ........................................................30

*Standard Iron Works v. ArcelorMittal*,
   2015 WL 6165024 (N.D. Ill. Oct. 20, 2015) ......................................43

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008) ..............................................................21

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
   699 F. App'x 8 (2d Cir. 2017) ...........................................................42

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
   669 F.3d 632 (5th Cir. 2012) .............................................................19

*In re Vitamins Antitrust Litig.*,
   No. MDL 1285, 2000 WL 33975411 (D.D.C. Nov. 17, 2000) .............41

*W. Alton Jones Found. v. Chevron U.S.A., Inc.*,
   97 F.3d 29 (2d Cir.1996) ...................................................................29

*Waldman v. Riedinger*,
    423 F.3d 145 (2d Cir. 2005) .................................................................21

*Wolff v. McDonnell*,
    418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) ........................37

*In re WorldCom, Inc. Sec. Litig.*,
    2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) ......................................43

## Rules

Federal Rule of Civil Procedure 23 .......................................... 4, 21, 31, 39

## Other Authorities

*Farnsworth on Contracts* § 7.10 (3d ed. 1999) .........................................27

Restatement (Second) Contracts § 202(1) ..................................................27

# INTRODUCTION

The district court and Plaintiffs' class counsel ("Class Counsel") went to great lengths to help appellant, AMA Capital, LLC ("AMA"), receive compensation from the settlements in this *indirect* antitrust purchaser class action—*Contant v. Bank of America* ("*Contant*")—for transactions properly documented to establish that it engaged in indirect foreign currency transactions that met the district court's approved settlement class definitions and which it had *not* previously submitted for compensation in the related *direct* purchaser antitrust class action—*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS ("*FOREX*"). AMA's claim was approved in part and, pursuant to the district court's distribution Order, will receive ▮▮▮▮▮. The key issues in this appeal are whether AMA should be allowed to seek: (1) compensation here based on *the same transactions* that it submitted successfully in the related direct purchaser class action; and (2) recovery, duplicate or otherwise, *without providing adequate documentation*—as required by the Court-approved Claim Form—despite being ordered to do so. The district court's rulings against AMA under these circumstances were not abuses of discretion and, were correct.

AMA admits that it attempted double recovery and asks this Court to endorse double dipping in this indirect purchaser antitrust class action. The district court ordered AMA to identify the transactions that it submitted in *Contant* and *FOREX*,

but AMA flouted the Order. SPA 3; Vol. 1 CA 168. As the district court explained, "AMA is not entitled to duplicate recovery on any claim, as the settlement classes and covered transactions in the two cases are mutually exclusive." SPA 18.

AMA raises procedural objections to the district court's ruling. They should be rejected for three primary reasons. First, AMA's claim submission in this case occurred after the deadline. The procedural objections AMA raises occurred primarily because Class Counsel was trying to *assist* it. Had the formal process been enforced strictly, without the exercise of Class Counsel's discretion, the Claims Administrator would have denied AMA's untimely submission.

Second, AMA has not submitted the required detailed transactional documentation, despite numerous opportunities. All Option Two claimants were required to submit such documentation to prefect their claims.

Third, AMA refused to comply with the district court's order to identify duplicate submissions in *Contant* and *FOREX*.

Class Counsel's goal has been to help AMA receive settlement funds for qualifying transactions for which it has not sought compensation in *FOREX*. However, if AMA were to recover twice for the same transactions—especially without proper documentation—that would unfairly diminish the recovery of other valid claimants. The district court did not abuse its discretion in rejecting AMA's claims.

## COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether AMA should be allowed to seek compensation in this indirect purchaser class action based on the same transactions that it submitted successfully in the related direct purchaser class action litigation; and

2.     Whether AMA is entitled to receipt of the settlement funds for purported transactions, duplicate or otherwise, without providing adequate documentation to substantiate that those transactions meet the Settlement Class Definitions, despite being ordered to do so by the district court.

## STATEMENT OF THE CASE

## I.     PRELIMINARY APPROVAL AND NOTICE TO THE SETTLEMENT CLASSES

Class Counsel engaged in settlement discussions with several different groups of Defendants which resulted in five settlements totaling $23,600,000 and resolved all claims. On July 29, 2019, the district court preliminarily approved settlements with two Defendants (Vol. 6 JA 1560) and, on July 17, 2020, preliminarily approved three additional settlements (collectively the "Settlement Agreements"). SA 15-32. This case involved eight state Settlement Classes; they are essentially the same except for the state of residency for transactions. Vol. 11 JA 2665-2668 ¶ 10. The California Settlement Class, of which AMA is a member, is defined, in pertinent part, as: "All persons and entities, who during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator and were thereby injured in

California by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator." Vol. 11 JA 2666 ¶ 10. The district court also approved Plaintiffs' plan to disseminate notice to the Settlement Classes ("Notice Plan") as the "best notice that is practicable under the circumstances" and "reasonably calculated" to apprise the Settlement Classes of their rights and options, meeting "the requirements of Federal Rule of Civil Procedure 23 and due process," (SA 26 ¶ 20); and preliminarily approved Plaintiffs' plan to allocate the net settlement fund to the Settlement Classes, finding the proposed methodology to be "a straight forward and equitable method of allocat[ion]" that "fairly accounts for the relative strengths and weaknesses of the claims of different categories of Settlement Class Members." SA 27 ¶ 21.

The Notice Plan included direct mail to 94,867 physical addresses, email to 43,309 addresses (Vol. 11 JA 2624-25 ¶¶ 12-13), and publication notice made through: a targeted press release; postings on investment websites; targeted social media advertising through Facebook and Instagram; and the maintenance of a settlement website. Vol. 11 JA 2626-28 ¶¶ 20-27. Members of the Settlement Classes were informed about this case's pendency, the Settlement Agreements' terms, exclusion rights, ability to object to the Settlements, and the binding effect of the Final Approval Order and Judgment's binding effect. The Notice Plan reached

approximately 95% of Settlement Class members on an average of 3.9 times each. Vol. 11 JA 2610 ¶ 3. None of the approximately 100,000 Settlement Class members opted out or objected to any aspect of the Settlements, including the plan of allocation and claim forms. Vol. 11 JA 2629 ¶ 33.

## II.    FINAL APPROVAL AND CLAIMS PROCESS

On November 20, 2020, the district court entered a Final Judgment, Order of Dismissal with Prejudice and Order Granting Motion for Final Approval of Class Settlements (Vol. 11 JA 2658) ("Final Approval Order"), finally approving the Settlement Agreements and the plan of allocation. Vol. 9 JA 2132. Subsequently, the district court approved two proposed claim forms (the "Claim Forms"). Vol. 11 JA 2698-2705. The Claims Administrator posted fillable online versions of the Claim Forms to the Settlement website and claims could be submitted online or by mail. Vol. 12 JA 2908-09 ¶ 6. During the claims period, Class Counsel and the Claims Administrator undertook additional efforts to increase the claims rate. Vol. 12 JA 2909-10 ¶¶ 8-10. The Claims Administrator issued a press release reminding Settlement Class members of the claims filing deadline. Vol. 12 JA 2909 ¶ 8. The Claims Administrator twice emailed Settlement Class members who had not yet filed a Claim Form a reminder of the claim filing deadline. Vol. 12 JA 2909-10 ¶ 9. The Claims Administrator also sent personalized email and letter reminders to individuals and entities in the top one percent estimated highest payouts that had not

filed a claim. Vol. 12 JA 2910 ¶ 10. A calling campaign was also conducted to reach these Settlement Class members. *Id*. The Claims Administrator and Class Counsel received and responded to nearly 4,000 phone calls and over 700 emails to address how to file claims and explain the required detailed transactional records required from foreign exchange dealers ("RFEDs") for Option Two claimants. Vol. 12 JA 2908 ¶ 5.

Claimants had the option of (a) having the Claims Administrator calculate their pro rata Settlement award based on transactional data obtained from the four largest RFEDs that operated during the Settlement Class Period of December 1, 2007, to July 19, 2019[1] ("Option One"); or (b) "submit[ting] detailed transactional records (e.g., account statements and transaction confirmations) ***and*** fill[ing] out and submit[ing] the 'Option Two Claim Form Spreadsheet' (template file posted on the Settlement website)" for purposes of calculating their *pro rata* award ("Option

---

[1] Substantial efforts were made to obtain transactional data from RFEDs. Plaintiffs served subpoenas on 61 purported RFEDs and Defendants served 58 subpoenas (most overlapping with Plaintiffs' subpoenas). Information could not be obtained from most of the entities because they either did not engage in retail foreign exchange operations during the relevant period, were no longer in business or no longer possessed responsive records. Counsel for certain RFEDs told Class Counsel that the RFED market was highly concentrated during the class period, and therefore most RFED transactions were executed by a small number of large RFEDs, including those from whom Class Counsel obtained data. SA 5-8. Plaintiffs' expert estimated the Settlement Classes consisted of 99,138 members. Vol 5 JA 1146 ¶ 19.

Two"). Vol. 11 JA 2700-05 (emphasis added). The Option Two Claim Form Spreadsheet ("Option Two Spreadsheet") was to be populated with transactional information supplied by Option Two Claimants and substantiated with detailed transactional records.

Each submitted Claim Form was assigned a unique claim number, required Claim Form information was entered into a proprietary database, and then reviewed and audited. Vol. 12 JA 2910-11 ¶¶ 12, 15. Option Two claims were reviewed and audited to ensure required information and detailed transactional records was submitted. *Id*.

The Claims Administrator contacted claimants by telephone and email to allow them to correct deficiencies. Vol. 12 JA 2907 ¶¶ 20-26. Some Claimants failed to select Option One or Option Two for their claim, or selected Option Two but never submitted the required transactional records or did not respond to the Claims Administrator. Their claims were defaulted to Option One if the claimant appeared in the transactional data obtained from the four RFEDs. Vol. 12 JA 2912 ¶¶ 20-21.

The Claims Administrator received and processed 11,311 Claim Forms and then, along with Class Counsel, ensured all submitted claims were valid and perfected before calculating each claimant's payment from the Net Settlement Funds. Vol. 12 JA 2911 ¶¶ 14-15. 10,348 claims were timely and 963 were late. Vol. 12 JA 2911 ¶ 14; Vol. 2 CA 509. 207 deficient claims were submitted; *all were*

*originally Option Two Claims*, although some converted to Option One Claims during the validation process. Vol. 12 JA 3114 ¶ 5.

Class Counsel and the Claims Administrator endeavored to ensure potentially valid claimants, including AMA, had time to cure deficient submissions. Vol. 12 JA 2913 ¶ 23; Vol. 2 CA 509-10. Due to Class Counsel's efforts, 51 deficient claims were cured in whole or in part, including AMA's claim. Vol. 12 JA 3114-15 ¶ 9. The remaining 156 deficient claims either failed to cure or did not respond to numerous requests to cure and were recommended for denial. Vol. 12 JA 3115 ¶ 10; Vol. 2 CA 509-10.

## III.    AMA'S CLAIM SUBMISSION

On May 12, 2021, AMA asked to submit a claim nearly two months late. It could have been validly denied on timeliness alone. However, Class Counsel exercised their discretion to allow AMA's late claim offering no "guarantee that [AMA] can participate in the distribution" and required submission within seven (7) days. Vol. 1 CA 25. On May 20, 2021, AMA submitted an Option Two Spreadsheet with over ▮▮▮▮ self-identified transactions relating to ▮ RFEDs, but no required detailed transactional documents. Vol. 2 CA 304.

Thereafter, AMA was repeatedly asked to submit the required detailed transactional documentation to support its claim (because none of AMA's claimed transactions appeared in the data obtained by Class Counsel) but AMA failed and

even refused to comply. On May 24, Class Counsel told AMA in writing that supporting documentation was required and to submit it by May 28. Vol. 1 CA 28. On May 26, AMA responded, but did not supply the documentation. Vol. 1 CA 30-33; Vol. 2 CA 307. On June 7, AMA submitted "cut and paste" copies of *three* "Fix messages" that AMA created for its claimed ███████ transactions. Vol. 1 CA 41-42; Vol. 2 CA 307. Again, *prior to the rejection* of AMA's claim, on June 9, Class Counsel told AMA in writing that its submission was insufficient, and the required documentation was requested again. Vol. 1 CA 44; Vol. 2 CA 307. On June 25, AMA provided original copies of some Fix messages and several account statements, but not complete detailed transactional records. Vol. 2 CA 307. Again, *prior to the rejection* of AMA's claim, on July 1, Class Counsel told AMA in writing that the materials were insufficient to perfect its entire claim. Vol. 1 CA 46; Vol. 2 CA 307. On July 4, AMA responded that it lacked the required detailed transactional records to validate every self-identified transaction on its Option Two Spreadsheet and proposed an audit in lieu of compliance with the district court-approved claims process. Vol. 1 CA 49-51; Vol. 2 CA 307. Class Counsel rejected AMA's proposal. On July 8, *prior to the rejection* of its claim, AMA was again informed in writing that it must submit detailed transactional records to perfect its claim. Vol. 1 CA 53-54; Vol. 2 CA 307. During this time, Class Counsel also had several telephonic

communications with AMA and/or its counsel, to discuss the types of documentation AMA was required to submit. Vol. 2 CA 303, 307-08.

On July 16, AMA unilaterally submitted a revised late claim. AMA also submitted some supporting documentation and explained, "The total number of trades is somewhat under *one half* and the volume is approximately *one third* the original submission." Vol. 1 CA 56 (emphasis in original); Vol. 2 304-05. AMA's July 16 claim submission was reduced to ███████ transactions through █ trading venues. Vol. 1 CA 56-57, 65. Approximately ███████ of the ███████ transactions were for trades for which AMA stated it did "not have documentation specifically identifying the Defendant at the other end of the trade" – an essential element of the Settlement Class Definitions. Vol. 1 CA 59; Vol. 2 CA 305. AMA also acknowledged it was seeking compensation for duplicate transactions in *Contant* and *FOREX* but did not identify the duplicates. Vol. 1 CA 57 at n 6.

AMA's materials submitted as of July 16, 2021, were extensively analyzed by Class Counsel's subject matter experts to: (1) assess the completeness and accuracy of the submitted materials; and (2) meet the Settlement Class Definition by (a) attempting to link transactions in the statements and Fix messages to transactions in AMA's Option Two Spreadsheet and (b) determining the mechanics of and parties to the transactions, and whether each identified transaction was made directly with one of the venues that AMA self-identified and, in turn, that venue was trading with

a *FOREX* Defendant. Vol. 1 CA 2-3. On August 13, 2021, the Claims Administrator sent a Claim Assessment to AMA's counsel based, in part, upon extensive analysis by Class Counsel and their subject matter experts. The assessment approved in part and denied in part AMA's claim. Vol. 1 CA 10-23. AMA's transactions that were supported by detailed transactional records that demonstrated they met the Settlement Class Definitions were approved. Vol. 1 CA 8-23. AMA's transactions for which detailed transactional records were not submitted or did not sufficiently show that the transactions met the Settlement Class Definitions were denied. *Id*.

On August 26, AMA sent "several additional documents" and requested an audit in lieu of compliance with the requirement to submit detailed transactional records. Vol. 1 CA 62-63. Class Counsel did not agree to an audit, supplementation of the late claim or further extension of time. Vol. 1 CA 3. On September 2, AMA attempted to further narrow its claim to eliminate █ more trading venues and ███████ transactions from its July 16, 2021 submission. Vol. 1 CA 75; Vol. 2 CA 305. AMA acknowledged that it had submitted some of the same transactions in *Contant* and *FOREX*, and that they had been "preliminarily accepted" by "the FOREX claim administrator." Vol. 1 CA 3, 66; Vol. 1 CA 114; Vol. 2 CA 311.

AMA's post July 16, 2021 submissions consisted of the cure documentation that it had been repeatedly requested to provide prior to the August 13, 2021 Claim Assessment, but had failed to do so.

AMA acknowledged it did not document denied transactions because it does not have some records, was unwilling to obtain others, and the records it does have but did not provide are unreliable, incomplete, "misleading" or insufficient to demonstrate compliance with the Settlement Class Definition. Vol. 1 CA 110 (burden); Vol. 1 CA 119-20 at ¶¶ 7-8 (burden and lacks records); Vol. 1 CA 120 at ¶ 8 (AMA's prime broker statements "may be misleading…and also may not contain sufficient information to reconstruct the details of each trade necessary for evaluation as an element of a *Contant* claim"); Vol. 1 CA 119 at n. 1 ("fields in FIX messages are commonly used for purposes that at best bear a vague resemblance to the specification"); *id.* (asserting Exec Broker field in one FIX message does not use the industry standard meaning and AMA ascribes its own meaning)); *see also* Vol. 1 CA 155-56.

Despite considerable efforts to assist AMA, it refused to help itself. AMA refused to comply with the Claim Form which facially required the submission of detailed documentation to substantiate the ▮▮▮▮ of Option Two Spreadsheet transactions on a one-for-one basis. SPA 2; Vol. 2 CA 508. AMA insisted that it was "unnecessary to demand more" detailed documentation and "[a]dditional records [would] not affect the determination whether the trades meet the class definition." Vol. 1 CA 112; Vol. 2 CA 508. In sum, on August 13, the Claims Administrator

granted in part and denied in part AMA's claim; the denied transactions were denied for a lack of the required detailed documentation.[2]

Following briefing on AMA's dispute as to the denied transactions, the district court found, "The settlement requires claimants to support their claims 'by such documents or proof as Class Counsel and the Claims Administrator, in their discretion, may deem acceptable.'" *See* SPA 2 (citing Vol. 9 JA 2113 § XI.d.i). The district court further found that AMA was required to submit "detailed transactional records" "for purposes of submitting [claimant's] *pro rata* claimant award" as set forth on its Option Two Spreadsheet. SPA 2. The district court ordered that for "denied claims, any that lack detailed transactional records are denied" and "that AMA's claims already accepted for payment shall be accepted by Class Counsel and the Claims Administrator for calculating AMA's *pro rata* award." SPA 2. The district court required additional briefing and directed AMA to address submission

---

[2] *See* Vol. 1 CA 155-56, 159-61; SPA 2; SPA 5; Vol. 2 CA 306. Specifically: 1) ███████ (supporting documentation related to 0.17% of the notional transaction volume claimed; 99.83% were denied for lack of any documentation. Vol. 1 CA 159); 2) ███████ (no documentation submitted to demonstrate these transactions met the Settlement Class Definitions. Vol 1 CA 160); 3) ███████ (supporting documentation related to 0.13% of the notional value of transactions claimed; 99.87% were denied for lack of documentation. Vol. 1 CA 160.); 4) ███████ (no documentation submitted for the vast majority of transactions. Vol 1 CA 160); 5) ███████ (supporting documentation related to 3.3% of the claimed transactional volume; 96.7% were denied for lack of documentation. Vol. 1 CA 161); 6) ███████ (supporting documentation relates to 0.49% of the total notional value claimed; 99.51% of AMA's transactions were denied for lack of documentation. Vo. 1 CA 161).

of duplicate claims. SPA 3. AMA failed to identify the duplicate transactions. Vol. 1 CA 168. The district court ordered that "all of the claims denied by Class Counsel are denied because they all lack detailed transactional records as required by the settlement" and ordered Plaintiffs to file their distribution motion. SPA 5.

AMA filed a motion for reconsideration of the transactions for which it submitted supporting documentation after July 16, 2021 (Vol. 2 CA 277-301), which Plaintiffs opposed. Vol. 2 CA 302-13.

## IV. AMA'S MOTION TO INTERVENE IS DENIED AND THE DISTRICT COURT APPROVES DISTRIBUTION OF THE SETTLEMENT PROCEEDS

AMA filed a motion to intervene (Vol. 12 JA 2877) which Plaintiffs opposed. Vol. 12 JA 3080. The district court denied AMA's motion as unnecessary because, as a class member, AMA had the right "to appeal any potential denial of its claim" citing *Rothstein v. American International Group, Inc.*, 837 F.3d 195, 204 (2d Cir. 2016). SPA 6 at 3.

Plaintiffs filed their motion to distribute the settlement funds. Vol. 12 JA 2880-2907. AMA was the only claimant to oppose the motion. Vol. 2 CA 314-503. Plaintiffs filed a reply in support of their motion. Vol. 2 CA 504-515.

The district court approved the allocation determinations, which consisted of 9,210 approved claims. SPA 12 ¶ 1; Vol. 12 JA 2914 ¶ 31. AMA will be paid ███████ for its partially approved claim. Vol. 2 CA 508. The district court also

approved payment of all late filed claims, rejected all deficient claims, and ordered that disbursement of the funds be held in abeyance until resolution of AMA's appeal. SPA 12 ¶¶ 2-4. No claimant will receive payment until AMA's appeal is resolved.

Approving the distribution motion, the district court found "Class Counsel and the Claims Administrator made significant efforts to ensure that class members filed claims and were aware of the claims filing deadline. Class Counsel and the Claims Administrator also exercised their discretion to process 963 late claims." SPA 18. The district court also found that "AMA points to no issues with the request for disbursement or claims administration process. AMA seeks to litigate its objection to the rejection of its claim as an issue of fairness, but points to no evidence that it was treated differently from any other similarly-situated class member." SPA 19. The district court also "decline[d] to transform the motion for disbursement into an opportunity for the sole objecting claimant [AMA] to scrutinize and seek justification for every decision made by Class Counsel and the Claims Administrator in the administration of the settlement." SPA 20.

The district court explained its reasons for denying AMA's motion for reconsideration (SPA 15-18), finding that "AMA [did] not identify any change of controlling law, any new evidence, the need to correct a clear error or prevent injustice, but rather rehashe[d] arguments already briefed and rejected by the Court." SPA 16. The district court determined AMA should not have presented evidence for

the first time in a motion for reconsideration when it could have been submitted earlier. SPA 16. Because the Settlement Agreements state that before rejection of a proof of claim, "the Claims Administrator shall communicate with the claimant in order to remedy the curable deficiencies in the proofs of claim submitted" (SPA 17), the district court found that the Claims Administrator complied with these terms of the Settlement Agreements as there was "no dispute that the Claims Administrator: (1) took steps to communicate with AMA to remedy the curable deficiencies prior to rejection; (2) provided AMA an opportunity to revise its proof of claim; and (3) reviewed AMA's revised proof of claim and transaction records prior to formally rejecting a portion of AMA's claim." SPA 17. The district court rejected AMA's argument that the Claims Administrator was "obligated to review new documentation and transaction records after rejecting the claim because the Settlement Agreements state that a claimant contesting a rejection must 'serve upon the Claims Administrator a notice and statement of reasons indicating the claimant's grounds for contesting the rejection along with any supporting documentation.'" ([Vol. 9 JA 2086] § XI(d)(v))." SPA 17. The district court explained "nothing about 'supporting documentation' suggests the process for contesting rejected claims should permit yet another bite at the apple to remedy deficiencies in the proof of claim submitted." SPA 17. Finally, the district court found AMA was "provided with an opportunity to supplement its submission prior to rejection" and thus the process

for contesting rejected claims was "not a chance to reopen the claims process in its entirety by permitting the submission of new evidence previously available to the claimant." SPA 18.

The district court also found that AMA did "not meet its burden for reconsideration because AMA failed to identify the duplicate transactions it submitted in *FOREX* an additional reason that AMA's claims were denied for lack of detailed records." SPA 18. "Any such claims belong either in the *FOREX* class settlement as direct trades, or the settlement here. AMA is not entitled to duplicate recovery on any claim, as the settlement classes and covered transactions in the two cases are mutually exclusive." SPA 18.

## SUMMARY OF ARGUMENT

The district court acted within its discretion by approving AMA's claim for its transactions supported by the required documentation, but denying the claim for transactions for which it failed to do so. AMA, and all Option Two claimants were required to complete the Option Two Spreadsheet *and* submit detailed transactional records to substantiate those transactions. Initially, AMA submitted no supporting transactional records. In the end, most of AMA's denied transactions were still not supported by *any* transactional records. Vol. 1 CA 158. As set forth in the Settlement Agreements, and as found by the district court, claims that "do not meet the submission requirements may be rejected" and before rejection of a proof of claim,

"the Claims Administrator shall communicate with the claimant in order to remedy the curable deficiencies in the proofs of claim submitted." *See*, e.g., Vol. 9 JA 2113-2115 §XI(d).

Consistent with the Settlement Agreements, AMA was given multiple opportunities to cure its deficient claim prior to denial. Class Counsel told AMA numerous times that its documentation was inadequate to substantiate its claim. AMA failed to submit the required detailed transactional records. The district court acted within its discretion, and correctly found AMA's denied claims lacked the required documentation. SPA 2, 5; Vol. 1 CA 155-56; Vol. 1 CA 159-161.

The process applied to AMA's claim complied with the Settlement Agreements. The district court correctly found that AMA was "provided with an opportunity to supplement its submission prior to rejection" and thus the process for contesting rejected claims was "not a chance to reopen the claims process in its entirety by permitting the submission of new evidence previously available to the claimant." SPA 18. Due process is not violated because AMA was not given yet more opportunities when it failed multiple times to cure its deficient claim during the cure period.

Finally, AMA improperly seeks duplicate recoveries in *Contant* and *FOREX*. As the district correctly found, AMA's "claims belong either in the *FOREX* class settlement as direct trades, or the settlement here. AMA is not entitled to duplicate

recovery on any claim, as the settlement classes and covered transactions in the two cases are mutually exclusive." SPA 18. AMA is not entitled to recover twice for the same transactions; allowing it to do so would subvert the rights of the other valid claimants, improperly reduce their claim amounts, and deprive Defendants in *Contant* and *FOREX* of the benefit of their settlement bargains.

## ARGUMENT

## I. STANDARD OF REVIEW

Challenges to the district court's approved claims process are reviewed for abuse of discretion. *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978) (district courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably"); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 179, 181 (2d Cir. 1987) (allocation scheme reviewed for abuse of discretion). The same standard applies to the evidentiary standard, or claims vetting process, the district court approves to evaluate claims documentation, including that used to screen potentially duplicative claims. *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 640 (5th Cir. 2012) ("There is no difference in standard for large versus small investors, and the alleged burden of 'obtain[ing] records from a third party' is not undue. The district court did not abuse its discretion in approving the settlement's claims-making process.").

AMA misstates the review standard and contends that its appeal concerns the "interpretation of a settlement agreement," which as with all purely legal issues is reviewed *de novo*. AOB at 27. AMA's appeal does not challenge the construction of the Settlement Agreements. AMA fails to identify any dispute concerning a term of the Settlement Agreements, and the district court did not interpret the Settlement Agreements when it approved the claims administration process. Instead, AMA challenges the claims administration process and settlement funds allocation.

AMA's central argument is that the district court should have accepted "summaries, estimates or exemplars" (AOB at 42), instead of the required detailed transactional documentation. Requiring detailed transactional records was appropriate here because every transaction on the Option Two Spreadsheet was self-identified by claimants. Without supporting documentation, any Option Two claimant could be paid for fictional transactions or for actual transactions that do not meet the Settlement Class Definitions. Detailed transactional documentation is necessary to ensure that: (1) Option Two Spreadsheet transactions meet the Settlement Class Definitions; and (2) are non-duplicative of the direct purchaser settlement. As these issues concern the claims administration process and not the interpretation of an agreement, they should be reviewed for abuse of discretion.

In seeking *de novo* review, AMA relies on inapposite case law concerning contract interpretation and selection of the appropriate legal standard for certifying

a Rule 23 class. *See Waldman v. Riedinger*, 423 F.3d 145, 148 (2d Cir. 2005) (appeal concerned the term "'affiliate' within the meaning of the Settlement Agreement" and whether class member's shares qualified under the terms of the agreement); *In re Petrobras Sec. Litig.*, 862 F.3d 250, 261 (2d Cir. 2017) ("While we review the district court's construction of legal standards de novo, we review the district court's application of those standards for whether the district court's decision falls within the range of permissible decisions."). Neither *Waldman* nor *Petrobras* concern review of the court approved claims administration process or documentation requirements. Neither addresses a class member's arguments that it should have been allocated more in a class action settlement based on a documentation requirement.

Under an abuse of discretion standard, the Court reviews "for clear error the factual findings underlying" the ruling. *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008)). "Under the clear error standard," this Court "may not reverse [a finding] even though convinced" if it were the fact finder it "would have weighed the evidence differently. Rather, a finding is clearly erroneous only if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*, 945 F.3d 53, 63 (2d Cir. 2019).

The district court made fact-intensive findings in partially rejecting AMA's claims, including that they were potentially duplicative of AMA's *FOREX* claims and may not have been based on transactions with RFEDs that were part of the Class Definition. *See Nodaway Valley Bank v. Cont'l Cas. Co.*, 916 F.2d 1362, 1365 (8th Cir. 1990) ("the allocation of settlement responsibilities requires a fact-bound inquiry similar to the type of inquiry required in the determination of negligence or discriminatory intent" and because "the district court is better positioned to determine the issue" allocation issues are reviewed under clearly erroneous standard).

## II.   AMA'S CLAIM WAS CONSIDERED CONSISTENT WITH THE TERMS OF THE CLAIM FORM AND SETTLEMENT AGREEMENTS

AMA argues that Class Counsel and the district court overlooked its submission of additional transaction data after its claim submission was formally rejected. AMA contends this data should have been considered under the Settlement Agreements, and as such, the claims process was not properly applied to it. AMA mischaracterizes the Settlement Agreements. AMA's submission was, as the district court found, considered consistent with the Settlement Agreements' terms.

The Settlement Agreements are clear. Before a claim is rejected, "the Claims Administrator shall communicate with the claimant in order to remedy the curable deficiencies in the proofs of claim submitted." *E.g.* Vol. 9 JA 2114 § XI(d)(iv). Here, the record supports the district court's determination that the "Claims Administrator

(1) took steps to communicate with AMA to remedy the curable deficiencies prior to rejection, (2) provided AMA an opportunity to revise its proof of claim, and (3) reviewed AMA's revised proof of claim and transaction records prior to formally rejecting a portion of AMA's claim." SPA 17. Prior to July 16, Class Counsel told AMA in writing four times, and during teleconferences with its counsel, that it failed to submit detailed transactional records to substantiate the self-identified transactions on its Option Two Spreadsheet and to remedy the curable deficiencies. *Supra* at 10-12.

The Claims Administrator considered AMA's late claim submissions, as of July 16, 2021, consistent with the terms of the Claim Form and Settlement Agreements to which no class member, including AMA, objected. On August 13, 2021, the Claims Administrator delivered the Claim Assessment to AMA's Counsel. What AMA provided thereafter, as discussed below, was of little value to the validation of its claim and included some transactional documentation that AMA had repeatedly failed or refused to provide during the cure period.

**A.  The Express Terms of the Settlement Agreements Do Not Require Acceptance of all AMA's Post July 16 Submissions and, even if accepted, AMA's Claim is Largely Defective and Does Not Materially Change the Outcome of the Claim Determination.**

AMA's challenge to the administration of its claim fails for two primary reasons. First, as the district court found, the administration of AMA's claim complied with the terms of the Settlement Agreements. Second, even if AMA's

contractual argument were correct, AMA's post-July 16, 2021 submissions fail to cure the deficiencies in its claim.

This Court has recognized that settlement agreements are part contract and part order and as contracts are interpreted "in accordance with general principles of contract law." *Rothstein v. American International Group, Inc.*, 837 F.3d 195, 205 (2d Cir. 2016). AMA's interpretation of the Settlement Agreements is incorrect. "When interpreting a contract, the intention of the parties should control, and the best evidence of intent is the contract itself." *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010) (alterations and internal quotation marks omitted). Where, as here, the terms are unambiguous, the Settlement Agreements must be interpreted "within [their] four corners, and not by reference to what might satisfy the purposes of one of the parties to [them]." *Rothstein*, 837 F.3d at 206.

Here, each claimant was required to submit a proof of "claim supported by such documents or proof as Class Counsel and the Claims Administrator, in their discretion, may deem acceptable;" claims that "do not meet the submission requirements may be rejected" and before rejection of a proof of claim, "the Claims Administrator shall communicate with the claimant in order to remedy the curable deficiencies in the proofs of claim submitted." *See*, e.g., Vol. 9 JA 2113-2115 §XI(d). The Settlement Agreements then explain:

> If any claimant whose claim has been rejected, in whole or in part, desires to contest such rejection, the claimant must, within twenty (20)

days after the date of mailing of the notice required in subparagraph 11(d)(iv) above, serve upon the Claims Administrator a notice and statement of reasons indicating the claimant's grounds for contesting the rejection along with any supporting documentation.

Vol. 9 JA 2115 XI(d)(v).

AMA argues that after the cure period prior to July 16th, the Claims Administrator should have considered all post July 16 submissions after it completed the Claims Assessment and rejected a portion of AMA's claim because the Settlement Agreement states that a claimant contesting a rejection must "serve upon the Claims Administrator a notice and statement of reasons indicating the claimant's grounds for contesting the rejection along with any supporting documentation." Vol. 9 JA 2086 § XI(d)(v)); AOB 28-33. This provision does not permit the submission of the very "supporting documentation" that, as here, Class Counsel and the Claims Administrator identified as the source of the deficiency and repeatedly told AMA was necessary to cure the deficient claim prior to the Claim Determination. As the district court correctly found, the process of contesting a rejected claim is not a chance to reopen the claims process in its entirety by permitting the submission of new evidence previously available to the claimant. SPA 17. AMA's claim was properly considered consistent with the Claim Form and Settlement Agreements.

AMA's argument based on its belated submission is also fatally flawed —it *never* provided the required documentation. *Supra* at 10-12. AMA initially did not include the required "detailed transactional records" to substantiate its claimed

transactions met the Settlement Class Definitions. Despite numerous opportunities to cure, AMA refused to do so. SPA 2. AMA submitted limited documentation, only a tiny fraction of which satisfied the documentation requirements. Rather than cure, AMA insisted that it was "unnecessary to demand more" detailed documentation and "[a]dditional records will not affect the determination whether the trades meet the class definition." Vol. 1 CA 112. AMA did not comply with the requirements of the Settlement Agreements and the district court's approved claim process. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996) (holding that "adequate performance of the contract by the plaintiff" is an element of a breach of contract claim). The district court correctly found that AMA's claims lacked the required documentation for the vast majority of its transactions. SPA 3, 5; Vol. 1 CA 155-56; Vol. 1 CA 159-161. *See infra* at III.C. for a discussion of the consideration of AMA's post-July 16, 2021 submissions. The district court partially approved AMA's claim for which it will be paid ██████.

### B. AMA's Interpretation of the Settlement Agreements Conflicts with their Plain Language.

AMA argues that Class Counsel and the district court misinterpreted the Settlement Agreements' cure provisions resulting in the partial denial of AMA's claim.

AMA's interpretation of the Settlement Agreement would frustrate the purpose of the agreements and render the claim process futile. Under New York law,

a contractual construction that renders any provision meaningless or superfluous should be avoided whenever possible, and a contract should be read to provide meaning to each provision. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if at all possible.' Rather, an interpretation that 'gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.'"); *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008) ("[T]he rules of contract construction require [the Court] to adopt an interpretation which gives meaning to every provision of the contract.").

A contract cannot be interpreted in a way that frustrates the purpose of that contract. *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 624 (S.D.N.Y. 2010); *see also BNF NY Realty, LLC v. Nissan Motor Acceptance Corp.*, No. 18 Civ. 3664 (LGS), 2019 U.S. Dist. LEXIS 9631, at *20-21 (S.D.N.Y. Jan. 9, 2019); *FCS Advisors, Inc. v. Fair Fin. Co., Inc.*, 2009 WL 1403869, at *6 (S.D.N.Y. May 19, 2009) ("A court should not interpret a contract in a manner that would be 'absurd... or contrary to the reasonable expectations of the parties.'"); Restatement (Second) Contracts § 202(1) (noting that in interpreting contracts the purpose of the contract should be given great weight); *Farnsworth on Contracts* § 7.10, at 468 (3d

ed. 1999) ("It seems proper to regard one party's assent to the agreement with knowledge of the other party's general purposes as a ground for resolving doubts in favor of a meaning that will further those ends, rather than a meaning that will frustrate them.").

Contract interpretation principles require rejection of AMA's interpretation. AMA claims that the Claims Administrator was obligated to review new documentation and transaction records after rejecting the claim under the circumstances here. Accepting that interpretation would render superfluous the entire section of the Settlement Agreements that pertain to the claims process. AMA's interpretation violates the very canon of contract construction on which it relies. AMA's interpretation would require serial review of defective claims, frustrating the purpose of the provision—to give a claimant *one* chance to cure a defective submission by submitting supplemental documents to validate its claim.

Despite numerous opportunities to cure the defect, AMA refused to do so. *See* SPA 17-18. Vol. 1 CA 110 (burden); Vol. 1 CA 119-20 at ¶¶ 7-8 (burden and lacks records); Vol. 1 CA 120 at ¶ 8 (AMA's prime broker statements "may be misleading…and also may not contain sufficient information to reconstruct the details of each trade necessary for evaluation as an element of a *Contant* claim"); Vol. 1 CA 119 at n. 1 ("fields in FIX messages are commonly used for purposes that at best bear a vague resemblance to the specification"); *id.* (asserting Exec Broker

field in one FIX message does not use the industry standard meaning and AMA ascribes its own meaning)); *See also* Vol. 1 CA 155-56.

Even if the Settlement Agreements were ambiguous, the District Court's interpretation should be given deference. As this Court has explained, when there is confusion about the meaning of a settlement agreement, "few persons are in a better position to understand the meaning of the [settlement agreement] than the judge who oversaw and approved it." *See W. Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d 29, 33 (2d Cir.1996) (quoting *United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 68 (2d Cir.1995)).

The district court acted within its discretion when it found that AMA was given the required opportunity to cure its defective claim and denied AMA "a chance to reopen the claims process in its entirety by permitting the submission of new evidence previously available to [AMA]." SPA 18.

### C. The Implied Covenant of Good Faith and the District Court's Equitable Powers Do Not Require Serial Review of AMA's Defective Claim.

AMA's argument that the implied covenant of good faith requires review of its entire claim submission is wrong. The implied covenant of good faith and fair dealing may be implied only "in aid and furtherance of other terms of the agreement of the parties." *Anthracite Capital, Inc. v. MP-555 West Fifth Mezzanine, LLC*, No. 03 Civ. 5219 (DLC), 2005 WL 1155418, at *9 (S.D.N.Y. May 17, 2005), *aff'd* 165

Fed. Appx. 875 (2d Cir. Dec. 20, 2005). The implied covenant of good faith and fair dealing *may not* "be used as a substitute for a nonviable breach of contract" claim, such as where a party attempts to use the implied covenant of good faith and fair dealing to state a claim for the alleged breach of terms not contained in the contract. *Id.*; *Sheth v. New York Life Ins. Co.*, 273 A.D.2d 72, 73 (1st Dep't 2000) (same); *see also Sathianathan v. Smith Barney, Inc.*, No. 04 Civ. 7122 (DAB) (FM), 2006 WL 538152, at *28 (S.D.N.Y. Feb. 24, 2006) ("The implied covenant cannot impose duties or limits on the contracting parties which are inconsistent with that contract.").

AMA seeks to do exactly what the law prohibits—use the implied covenant of good faith to bolster an alleged breach of terms not contained in the contract. AMA does not cite any decision holding that the implied covenant of good faith and the district court's equitable principles require serial review of a defective claim submission. AMA's cited authority is inapposite. In *Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F. Supp. 2d 440, 448 (S.D.N.Y. 2004), the court held only that the claims administrator was obligated to take reasonable steps to give claimants the opportunity to correct the deficiency in their claims when the court determined the claim administrator did not act diligently. *Id.* In that case, the claims administrator was obligated to reject any claims that were not signed. "However, when unsigned forms initially arrived, the Claims Administrator could not, in good faith, remain inert. Particularly because the signature line was on the back of the form, it was

inevitable that some claimants, many of whom apparently do not speak English as a first language, would overlook it." *Id.* The claims administrator's conduct in *Dahingo* stands in stark contrast to the efforts here to assist AMA perfect its claims. *Supra* 10-12. Equity demands that AMA's argument fail because its refusal to comply with the documentation requirements have delayed payments to approximately 10,000 claimants who submitted valid claims.

## III.   AMA WAS AFFORDED THE PROCESS THAT IT WAS DUE

### A.   The Proper Evidentiary Standard Mandates Denial of the Appeal.

A district court's allocation decisions are within its discretion unless the underlying factual findings are clearly erroneous. *Atl. Specialty Ins. Co.*, 945 F.3d at 63. The district court's allocation decisions were not clearly erroneous and should be affirmed. Federal Rule of Civil Procedure 23 provides the district court considerable discretion in approving a claims administration process because district courts have "broad supervisory powers" over the class action settlement administration. A district court's determinations regarding allocation are entitled to deference due to its role as a fiduciary for all class members. *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d at 181. District courts may properly require detailed documentation because "it [i]s incumbent upon the district court to exercise its broad supervisory powers over the administration of class-action settlements to allocate

the proceeds among the claiming class members more equitably." *Beecher*, 575 F.2d at 1016.

District courts have discretion to award no compensation for claims that lack documentation or are duplicative, as part of the allocation process, because these claims diminish funds available for documented claims. *See In Re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001) (no abuse of discretion to consider "the ability of being proved with concrete documentation" and whether claims are "readily valuated in terms of time and inflation" in allocation); *In re "Agent Orange"*, 818 F.2d at 183-84 (allocating funds based on "weigh[ing of] the relative deservedness" of the claims); *Curtiss-Wright Corp. v. Helfand*, 687 F.2d 171, 174 (7th Cir. 1982) ("[t]o make an equitable allocation in this case the judge did not have to resolve trial-type issues of liability and therefore did not have to conduct a trial. He had only to weigh the relative deservedness.").

The district court acted within its discretion by requiring self-identified transactions in all Option Two Spreadsheets be supported by detailed transactional records. First, these records allow objective verification of claims based on self-identified transactions and, therefore, enhance the reliability of claims by ensuring that only valid claims are paid. This is fair to all class members and ensures that the settling Defendants receive the benefit of the bargain. Second, the district court's concern with duplication of claims submitted to the *FOREX* direct purchaser

settlement are valid. Detailed transactional records are necessary to demonstrate compliance with the Settlement Class Definitions.

AMA suggests a district court is *required* to accept summaries, estimates, or exemplars, and errs when it does not do so. AOB at 40-42. AMA's contention is at odds with a district court's discretion to allocate settlement funds. The bare minimum documentation identified by AMA may be acceptable in some class actions. It would severely curtail the district court's supervisory role, however, to deprive it of discretion to require more reliable documentation in appropriate circumstances. AMA's proposed approach – little or no documentation – would deprive the district court of the ability to screen for claims that are based on fraudulent transactions, that do not meet the Settlement Class Definitions, or that are duplicative of approved claims submitted in *FOREX*. The district court's exercise of discretion here is particularly salient because the Settlement Class Definitions are narrowly proscribed, tailored to the facts and claims at issue and because of AMA's admissions about the unreliable, incomplete, "misleading" or otherwise insufficient nature of its own documents.

AMA claims it seeks to apply an "objective" standard that protects "the due process rights of unnamed class members." AOB at 41. Not so. By insisting on a loose evidentiary standard for its claims (or, none at all), AMA improperly seeks to constitutionalize a rule that district courts can require only minimal (or no)

documentation as part of every claims administration process or, as to the majority of AMA's transactions, no documentation at all. *See* § III.A.2.

Requiring the bare minimum documentation (or none at all) would also interfere with Class Counsel's duty to protect the interests of all class members, as well as the district court's supervisory powers. AMA's proposed standard would require courts to accept class members' assumptions, estimates, guesses, interpretations of settlement class definitions, and honesty rather than simply requiring objective documentation. AMA's proposed standard is hopelessly unworkable as it cannot apply equally to every case. AMA may have preferred to submit estimates and summaries, whereas other class members who documented their claims would certainly not. However, AMA's own serial revisions and admissions regarding its unreliable, incomplete, "misleading" or otherwise insufficient documentation and submission of duplicative claims in *FOREX* proves the point that, here, the district court's discretion was exactly what was required to protect the integrity of the claims process and to fairly effectuate the terms of the Settlement Agreements. If assumptions, estimates, guesses, subjective interpretations, and honesty rather than objective documentation alone sufficed, AMA would not have serially revised its claims continually eliminating transactions.

A district court has sound discretion, in approving a claims administration methodology, to determine what standard to apply. AMA cannot show that the

district court abused its discretion simply because AMA would have preferred a less stringent documentation requirement or none at all. Accepting AMA's arguments would make it impossible for the district court to fulfill its fiduciary obligation to all class members. The district court properly approved a claims administration process that ensured claims are paid based on properly documented trades rather than summaries and supposition.

## 1. The District Court's One-for-One Statement Requirement is Proper.

The district court found, "The settlement requires claimants to support their claims 'by such documents or proof as Class Counsel and the Claims Administrator, in their discretion, may deem acceptable.'" SPA 2 (quoting Vol. 9 JA 2113 § XI.d.i). The district court-approved Claim Form required that Option Two claimants "*must* submit detailed transactional records." Vol. 11 JA 2700 (emphasis added). The district court found that AMA did not comply with the requirement to submit detailed documentation to substantiate transactions on a one-for-one basis. SPA 2. Rather, AMA insisted that it should not be required to submit detailed documentation and its failure to submit anything but handpicked exemplars would "not affect the determination whether the trades meet the class definition." Vol. 1 CA 112. But, of course, that is not true. Documentation could – and did – establish that some or all of AMA's claims did not meet the Class Definition. Indeed, AMA's serial narrowing of its initial submission indicates that simply relying on a claimant's

35

say so likely guarantees invalid claims will be paid. The district court acted within its discretion by denying all transactions for which AMA did not submit the required one-for-one detailed transactional records. SPA 2; SPA 5; SPA 15.

### 2. The District Court Correctly Required AMA to Comply with the Court-Approved Documentation Standards.

AMA's claim that it did not receive due process is baseless and contrary to the record. First, AMA waived this argument by not raising it below. Second, AMA cannot show a due process violation. AMA's objection boils down to a disagreement with the claims process, which, as shown below, was fair and reasonable, not unduly burdensome or demanding. AMA's claim received the same treatment as every other claim, and AMA received all the process it was due.

AMA never expressly argued due process below. For that reason, AMA has forfeited the issue and this Court need not consider it. This Court requires that parties raise relevant legal arguments to preserve them for appellate review. *Doe v. Trump Corp.*, No. 20-cv-1278, 2021 U.S. App. LEXIS 22317, at *21-22 (2d Cir. July 28, 2021) (citing *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)); *see also Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005) ("[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." (alteration in original) (internal quotation marks omitted)); *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 446 (2d Cir. 2006) (explaining that the "law in this Circuit is clear that where a party . . . advances arguments available

but not pressed below, . . . waiver will bar raising the issue on appeal") (internal quotation marks and citation omitted). It does not matter that AMA's belated due process argument involves a constitutional issue. The doctrines of waiver and forfeiture apply to constitutional objections. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 143, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967) ("[I]t is . . . clear that even constitutional objections may be waived by a failure to raise them at a proper time . . . ."); *Keepseagle v. Perdue*, 856 F.3d 1039, 1052-56 (2017) (rejecting constitutional and statutory challenges to class action settlement agreement's cy pres provision because these claims were not raised in the district court and, therefore, were waived or forfeited). In the district court, AMA never asserted that its constitutional due process rights were violated. The Court should find that AMA waived the argument.

Nevertheless, AMA's due process argument lacks merit. Although not entirely clear, it appears that AMA asserts a procedural due process violation.[3] A

---

[3] AMA cannot establish a substantive due process violation. Substantive due process is a means of "protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). To "establish a violation of a right to substantive due process, [after plaintiff demonstrates that it was denied a valid property interest,] a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8, 118 S. Ct. 1708, 140 L.Ed.2d 1043 (1998)). To satisfy this standard, a plaintiff must show that the government decision it challenges "was arbitrary or irrational or motivated by bad faith." *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989). Far from shocking the conscience, consideration of AMA's claim was guided by a carefully crafted, court-approved

procedural due process claim has two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process. *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012) (citing *Narumanchi v. Bd. of Trustees*, 850 F.2d 70, 72 (2d Cir. 1988)). Parties who assert a procedural due process violation must show a denial of an adequate opportunity to be heard. *Progressive Credit Union v. City of N.Y.*, 889 F.3d 40, 54 (2d Cir. 2018).

Having been told four times over weeks that its claim was defective for failure to provide the required detailed transactional records and afforded multiple opportunities to cure and perfect its serially revised late claim (*supra* 10-12), AMA received due process. As the district court found, *before rejecting AMA's claim*, Class Counsel took steps "to communicate with AMA to remedy the curable deficiencies," AMA was given "an opportunity to revise it proof of claim" and its revised claim and supporting records were reviewed. SPA 17. The district court acted within its discretion finding that "the process of contesting a rejected claim, where, as here, the claimant is provided with an opportunity to supplement its submission prior to rejection, should be viewed as the functional equivalent of a motion for reconsideration and not a chance to reopen the claims process in its entirety by permitting the submission of new evidence previously available to the

process that treated AMA like all other class members. This is the opposite of arbitrariness, irrationality or bad faith. AMA cannot come close to meeting the high bar to establish a substantive due process violation.

claimant." *Id*. at 17-18. AMA was given due process to submit and support its claim. Indeed, even though AMA's claim was originally submitted without any of the required detailed transactional records, the portion of its revised claim that was properly supported by detailed transactional records that showed back-to-back transactions (between AMA the RFED and a Defendant) was approved and will be paid when the funds are distributed. Although AMA would have preferred not to have to submit records showing back-to-back transactions, it fails to understand that without doing so it cannot establish membership in one of the Settlement Classes for its self-identified submitted transactions. Back-to-Back transactions are an explicit requirement of the Settlement Class Definitions. AMA seeks to evade the Rule 23's requirements by refusing to submit documentation necessary to establish class membership based on objective criteria for the portion of its claim that was denied. If the transactions do not meet the requirements of the Settlement Class Definitions, then they are not included in the Settlements and cannot be compensated. AMA's true and bizarre gripe is that – as an entity whose sole business was to engage foreign currency transactions to the tune of billions of dollars of notional value – it is too onerous for it to submit the required detailed transactional records, primarily, because it lacks them or its records are unreliable. The requirement to submit records as part of a settlement to show class membership is common. *See, e.g.*, *In re Auction Houses Antitrust Litig.*, 42 F. App'x 511 (2d Cir. 2002) (affirming approval of

settlement which distributed funds to class members pro rata based on consignments made and sellers' commissions paid by each class member during the relevant time period); *Alaska Elec. Pension Fund v. Bank of Am., Corp.*, No. 14-cv-7126, 2020 WL 916853, at *1 (S.D.N.Y. Feb. 26, 2020) (approving distribution of settlement funds following claims administrator's determination of claimant eligibility); *In re Vitamins Antitrust Litig.*, No. MDL 1285, 2000 WL 33975411, at *1 (D.D.C. Nov. 17, 2000) (approving distribution of settlement funds following documentation of each claimant's right to participate in settlement fund).

AMA further complains it "should not have to prove something that class counsel believes could be determined from documents available only through a subpoena." AOB at 46. AMA is wrong. Class Counsel obtained transactional data from RFEDs to streamline the claims process. The transactional data that Class Counsel obtained via subpoena formed the basis of Option One Claims and alleviated the need for virtually every claimant to submit any documentation. Claimant supplied transactional data, such as account statements, was needed to support the small number of Option Two Claims. Class Counsels' efforts were highly effective: the Claims Administrator received 11,311 Claim Forms, of which 11,223 selected Option One, 74 selected Option Two and 14 selected both. Option Two Claims were to be supported with detailed transactional records such as "account statements and transaction confirmations" precisely because the claimed

transactions did not appear in the data that Class Counsel collected after serving 61 subpoenas on the RFEDs that operated during the Class Period. Account statements are provided to account holders in the regular course. It is incorrect to suggest AMA must issue a subpoena to obtain its own account statements. AMA, an Option Two claimant, must show *valid* transactions that meet the Settlement Class Definitions. AMA either possessed the detailed transactional records or had access to them from the entities through which it engaged in these transactions. That neither AMA nor the RFEDs whom Class Counsel subpoenaed possess such records suggests that they never existed. Regardless, their absence is not a reason to divert settlement funds to from valid claimants to AMA.

This Court has recognized that distribution of settlement funds must be fair and reasonable. *In re Tremont Sec. Law, State Law & Ins. Litig.*, 699 F. App'x 8, 13 (2d Cir. 2017) (holding that the district court did not abuse its discretion in approving an allocation plan because the plan was "fair and reasonable"). Like the Settlement Agreements themselves, the plan of allocation "must also be fair and reasonable." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 316 (E.D.N.Y. 2006); *see also In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 158 (S.D.N.Y. 2013) ("When formulated by competent and experienced counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis."); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd*, 117

F.3d 721 (2d Cir. 1997) (per curiam) ("the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information"). Important factors, all present here, in formulating an effective claims and distribution process are having experienced class counsel working with experts to establish the procedure. *See In re PPDAI Grp. Inc. Sec. Litig.*, No. 18-CV-6716 (TAM), 2022 U.S. Dist. LEXIS 11427, at *33-34 (E.D.N.Y. Jan. 21, 2022) (finding that "the method for processing settlement class members' claims and distributing the net settlement fund to eligible claimants includes well-established, effective procedures, and was developed with the assistance of a financial consultant"); *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 694-95 (S.D.N.Y. 2019) (approving plan of distribution and noting that "Class co-counsel, who are experienced and competent in class actions, prepared the proposed Plan of Distribution in consultation with industry and economic consultants, as well as the proposed Claims Administrator"). Furthermore, the claims processing method "should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *In re Payment Card Interchange Gee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 40 (E.D.N.Y. 2019) (citing Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment); *see Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 590-91 (N.D. Ill. 2011) ("Class members have filed more

than 100,000 claims. This excellent response strongly suggests that many of the concerns about the allegedly burdensome or confusing character of the claims process were unwarranted."); *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) (holding that "[t]he [one] objection to the length and complexity of the proof of claim form is meritless," as "the information that claimants are required to submit is necessary in order for a fair distribution of the settlement proceeds").

AMA was given many opportunities to cure the deficient portion of it claim and the district court acted within its discretion in denying AMA's requested relief. In *Standard Iron Works v. ArcelorMittal*, 2015 WL 6165024 (N.D. Ill. Oct. 20, 2015), the district court acted similarly. There, two class members objected to the disbursement motion claiming that their data supported a greater award. The court overruled the objections and found that the claims administrator's rejection of the claims was "reasonable" because, "[a]lthough [the objectors] have been given many opportunities over many months to substantiate their claims, both have failed to do so." *Id.* at *2. For that reason, rejection of the claims was "the only reasonable" decisions that the claims administrator could have "reached on the record before it." *Id.* The same is true here and the Court should affirm.

**B.      AMA's Refusal to Identify Duplicative Claims Supports the District Court's Exercise of Discretion.**

The district court properly exercised its discretion by requiring AMA to comply with the requirement that Option Two claimants supply detailed transactional records. Doing so ensured that claimants, such as AMA, did not obtain duplicate recoveries. As the district court correctly found, AMA's "claims belong either in the FOREX class settlement as direct trades, or the settlement here. AMA is not entitled to duplicate recovery on any claim, as the settlement classes and covered transactions in the two cases are mutually exclusive." SPA 18. To allow AMA to recover twice for the same transaction would subvert the rights of the other valid claimants and improperly reduce their claim amounts and deprive Defendants in both cases of the benefit of the bargain in their settlements.

The district court properly required more than AMA's self-reporting to ensure that the claims allocation process did not "double dipping" with the direct purchaser settlement. This exercise of discretion is consistent with the district court's duty to "weigh the relative deservedness" of claims by considering lack of documentation as well as whether claims would have been released by a prior settlement or outside the class definition. *Curtiss-Wright*, 687 F.2d at 174. This is especially true here where AMA conceded that many of the transactions for which it seeks payment were approved for payment in *FOREX* (Vol. 1 CA 3, 66; Vol. 1 CA 114; Vol. 2 CA 311)

and AMA failed to comply with the district court's order to identify duplicate transactions. SPA 3; SPA 18.

AMA argues that it "identified generally duplicate trades" (AOB at 29), and that the district court should first allow AMA's entire claim, without regard to transactional records, and then have AMA "assist" the Claims Administrator in identifying the duplicative trades "by venue" after the fact. AOB at 52-53. There are at least three problems with that proposal that confirm the district court acted within its discretion.

First, AMA's proposal lacks an objective basis to determine whether trades were duplicative. The required transactional records are more reliable than AMA's *ad hoc* after-the-fact self-identification process. That parties would have to engage in such a process confirms that self-identification is unreliable. AMA's argument concedes that its self-identification included invalid claims. AMA now claims the district court erred by not allowing it to cure an admittedly erroneous self-identification process in the first instance with a second self-identification process. AMA's proposed procedure demonstrates exactly why the district court's requirement that Option Two Claimants provide detailed transaction records was proper.

Second, AMA's method creates a presumption, to be contradicted only by AMA itself, that a transaction is not duplicative. AMA seeks to have its allocation

determined first, and then go back and identify based on its own *ad hoc* search, what trades are duplicative. Apart of the risk that Settlement Class Members would be self-serving in this review, this method improperly creates a *presumption* that a trade is within the Class Definitions, and non-duplicative, without a showing.

Third, AMA's preferred method of identifying duplication is structurally flawed as it increases the risk of compensating duplicative trades and would delay the claims administration process further and impose potentially enormous costs on the validation process that could be efficiently resolved with objective documentation. It is likely that very few class members would undertake the effort to self-identify duplicative trades. If the Claims Administrator were required to perform the type of review AMA demands for all class members, however, there would be hundreds of negotiations carried out with no required reference to underlying trading records. The resulting agreements between the Claims Administrator and class members would then be reached with significant information asymmetries and lead to inconsistent results.

### C.  AMA's Post-July 16, 2021 Submissions Were Not Timely and AMA Was Afforded Due Process.

The district court properly denied AMA's Motion for Reconsideration and approved the claims determinations because AMA's post July 16 submissions were untimely. AMA argues that Class Counsel deprived it of the right to cure and improperly refused to consider documentation it provided after its July 16 claim

submission on which the Claim Assessment was based. The district correctly disagreed.

First, citing the Settlement Agreement, AMA claims it did not receive notification of the right to cure curable deficiencies prior to rejection of its claim. Vol. 2 CA 279, citing and quoting Vol. 9 JA 2114 § XI.d.iv. However, that is the process AMA was afforded, repeatedly, as Class Counsel has explained (*see* Vol. 1 CA 1-2) and which AMA acknowledged. Vol. 1 CA 110; *see also supra* 10-12.

AMA initially submitted a late Option Two Claim Spreadsheet with ████ of transactions but none of the required "detailed transactional records." *Supra* 10-12. The claim could have been rejected entirely on that basis alone. However, pursuant to the Settlement Agreement language AMA cites, prior to the rejection of AMA's claim, on May 24, AMA was informed in writing that supporting documentation was required and told to submit it by May 28. Vol. 1 CA 28. On May 26, AMA responded, but did not supply documentation. Vol. 1 CA 30-33. On June 7, AMA submitted "cut and paste" copies of Fix messages that it created for three of its ████ transactions. Vol. 1 CA 41-42. Again, prior to the rejection of AMA's claim, on June 9, AMA was informed in writing that its submission was insufficient, and documentation was requested. Vol. 1 CA 44. On June 25, AMA provided original copies of some Fix messages and a few account statements but not complete detailed transactional records corresponding to its spreadsheet. Again,

prior to the rejection of AMA's claim, on July 1, AMA was informed in writing that the materials were insufficient. Vol. 1 CA 46. On July 4, AMA responded that it lacked detailed transactional records to validate every transaction on its spreadsheet and proposed an audit. Vol. 1 CA 49-51. AMA's proposal was rejected and, again, on July 8, prior to the rejection of its claim, AMA was informed in writing that it must submit detailed transactional records. Vol. 1 CA 53-54. On July 16, AMA revised its late claim and attempted to cure with additional documentation, stating: "[t]he submission consisted of "Category A" transactions with "certain FIX messages and statements [that] specifically disclose that the intermediary traded with a Defendant" and "Category B" transactions that "do not have documentation specifically identifying the Defendant at the other end of the trade." Vol. 1 CA 59.

Months after multiple "communicate[ions] with [AMA] in order to remedy the curable deficiencies in the proofs of claim submitted" and opportunities for AMA to cure it claim "[p]rior to rejection of [AMA's] proof of claim and release form," AMA's claim was determined based on its July 16 submission. The Claim Assessment was delivered on August 13, 2021. AMA was notified many times prior to August 13 about the deficiencies. Indeed, AMA separately stated that "[o]n at least eight occasions AMA suggested an audit or to work directly with the subject-matter experts to confirm that trades were made and properly categorized, as was done in FOREX." Vol. 1 CA 110. Thus, despite its insistence that it did not have to

provide detailed transactional documentation, AMA understood it had not done so and was engaged in the process to cure prior to rejection of its claim. On reconsideration, AMA argued that it: "consistently asked between May and July whether AMA's claim had been rejected as required under section XI of the settlement to make sure the clock was not running on its submission. Class Counsel never said it was." Vol. 2 CA 279 n.1. Thus, each communication to AMA from May 24 to July 8, indicating that its claim had not been rejected and giving it the opportunity to cure, was the required "communicat[ion] with the claimant in order to remedy the curable deficiencies in the proofs of claim submitted" "[p]rior to rejection of a proof of claim" that AMA now claims did not happen until August 13. AMA simply refused to further cure its claim and argued that it was "unnecessary to demand more" detailed documentation and "[a]dditional records will not affect the determination whether the trades meet the class definition." Vol. 1 CA 112. The Court found, as Class Counsel warned, AMA was wrong.

Second, despite extensive efforts urging AMA to cure its claim, AMA claims that the Settlement Agreement entitles it to supplement its late claim with the same information it refused to provide when it was entitled to cure. AMA claims that it had right to do so under the Settlement Agreement provision that provides that if the Claimant contests the Claim Assessment, it can "serve upon the Claims Administrator a notice and statement of reasons indicating the claimant's grounds

for contesting the rejection along with any supporting documentation." Vol. 9 JA 2114 § XI.d.iv. AMA's argument makes no sense where, as here, it was given multiple opportunities to cure its deficient claim filing and refused to do so. Vol. 1 CA 112. AMA even litigated the basis for its refusal and lost. SPA 2. AMA's interpretation of the Settlement Agreement that Plaintiffs extensively negotiated with highly experienced defense counsel and that the district court approved would require the Claims Administrator to informally analyze every claim before making a formal determination, and then work with claimants to cure all known deficiencies, only to provide the same claimant with an opportunity to cure the same uncured deficiency after making a formal written claim determination detailing the reasons for the denial where the same reason was communicated as a basis for potential denial prior to rejection of the claim and the claimant refused to cure, only to repeat the process when the claimant made subsequent serial revisions. The submission of supporting documents post-claim determination goes to the bases for denial for which the claimant was not given an opportunity to cure prior to claim rejection. AMA received the process that it was due, and more.

Regardless, the outcome of AMA's claim is unlikely to change. AMA's post July 16 submissions were evaluated and—even if they were timely and processed as AMA urges in this appeal—few, if any, of the denied transactions would be considered eligible even if AMA had addressed its submission of duplicate claims

50

in *FOREX*, which it has not. Vol. 2 CA 309-12. At issue are AMA's denied transactions with three RFEDs, ███████████ and ███████████. As to ████, after July 16, AMA submitted the same type of documentation found to be invalid in its July 16 submission. Vol. 2 CA 309-11. Regardless, AMA's ████ trades were duplicated and approved in *FOREX* (*see id.* and Vol. 1 CA 114) and AMA has never identified duplicated transactions. As to the ██████ transactions for which AMA submitted documentation on August 26, a small number could be valid, as some of AMA's ██████ transactions were approved in AMA's initial Claims Assessment. Vol. 2 CA 311. However, AMA later revealed that "many ██████" trades have been "preliminary accepted by FOREX." Vol. 2 CA 311; Vol. 1 CA 114. Thus, it is unlikely that those transactions are valid because they are duplicates. Finally, as of July 16, AMA claimed █████████████ transactions, but only provided detailed transactional information (Fix messages) for ██ transactions all of which were approved, the remainder were denied. Vol. 2 CA 312; Vol. 1 CA 166. After July 16, AMA sufficient detailed transactional documentation (Fix messages) for an additional ██ transactions that had been denied for lack of documentation. Vol. 2 CA 312. As to AMA's remaining ████████████ transactions, AMA admits that it does not have and cannot provide Fix messages to corroborate them. Vol. 2 CA 312; Vol. 2 CA 283-84.

### D. AMA's Use of Prime Brokers is Irrelevant to the Claim Determination and the District Court's Decisions.

AMA's argument concerning transactions through prime brokers (AOB 53-56) is irrelevant. AMA's use of prime brokers was not a basis for the denial of its claim. The overwhelming majority of AMA's denied transactions were not supported by *any* transactional records. Vol. 1 CA 158. As to denied transactions for which some documentation was provided, AMA failed to submit detailed transactional records consisting of "documents or proof as Class Counsel and the Claims Administrator, in their discretion…deem[ed] acceptable" to satisfy the Settlement Class Definition for the denied transactions that AMA challenges. *See* Vol. 9 JA 2113 § XI.d.i; SPA 2. Neither Class Counsel nor the Claims Administrator could reliably determine that the Contested Denials for which *some* documentation was provided met the Settlement Class Definitions. Vol. 1 CA 158. The district court found and ordered that "all of the claims denied by Class Counsel are denied because they all lack detailed transactional records as required by the settlement." SPA 5. Accordingly, the use of prime broker was not a reason by itself that a transaction was denied rendering the issue irrelevant to this appeal.

## IV. APPELLEE DOES NOT CHALLENGE AMA'S STANDING TO PURSUE AN APPEAL DESPITE ITS LACK OF MERIT

As Appellees argued and as the district court found, AMA's Motion to Intervene was improper and unnecessary because, as an apparent member of the

Settlement Class, AMA can appeal the denial of its claim. Vol. 12 JA 3080-81; SPA 8. There is no dispute on this point as AMA's claim was approved in part by the Claims Administrator and then the district court. SPA 2; SPA 12 ¶ 4. This Court's *Rothstein* decision shows that intervention is unnecessary for AMA to appeal the district court's determination of its late claim. *Rothstein, Inc.*, 837 F.3d at 203.

## CONCLUSION

The district court acted well-within its discretion when it denied AMA's duplicative and unsubstantiated claims. Respectfully, the Court should affirm the district court's decision.

Dated:    Philadelphia, Pennsylvania    BERGER & MONTAGUE, P.C.
             May 25, 2022

By: /s/ Michael Dell'Angelo
Michael Dell'Angelo
Michael J. Kane
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000

*Attorneys for Plaintiffs-Appellees James Contant, on behalf of themselves and all others similarly situated, Martin-Han Tran, on behalf of themselves and all others similarly situated, Carlos Gonzalez, on behalf of themselves and all others similarly situated, Ugnius Matkus, on behalf of themselves and all others similarly situated, Jerry Jacobson, on behalf of themselves and all others similarly situated, Paul Vermillion, on behalf of themselves and all others similarly situated, Sandra Lavender, on behalf of themselves and all others similarly situated, Victor Hernandez, FX Primus Ltd., Charles G. Hitchcock, III, Tina Porter*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,853 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated:   Philadelphia, Pennsylvania       BERGER & MONTAGUE, P.C.
            May 25, 2022

By: /s/Michael Dell'Angelo
Michael Dell'Angelo
Michael J. Kane
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000
*Attorneys for Plaintiffs-Appellees James Contant, on behalf of themselves and all others similarly situated, Martin-Han Tran, on behalf of themselves and all others similarly situated, Carlos Gonzalez, on behalf of themselves and all others similarly situated, Ugnius Matkus, on behalf of themselves and all others similarly situated, Jerry Jacobson, on behalf of themselves and all others similarly situated, Paul Vermillion, on behalf of themselves and all others similarly situated, Sandra Lavender, on behalf of themselves and all others similarly situated, Victor Hernandez, FX Primus Ltd., Charles G. Hitchcock, III, Tina Porter*